William David REAGAN, et
al., Petitioners,

v.

Lester VAUGHN, et al., Respondents.

No. C–9548.

Supreme Court of Texas.

Dec. 19, 1990.

Rehearing Overruled In Part
March 6, 1991.

Mr. William Fred Hagans, Sylvette C. Bobb, Houston, for petitioners.

Mr. John P. Venzke, Houston, for respondents.

## OPINION

GONZALEZ, Justice.

In this case, we are presented with the issue of whether a child has a right to recover damages for loss of consortium and mental anguish when a parent is injured but not killed by the tortious conduct of a third party. The court of appeals, stating that it did not have the authority to recognize such a cause of action,[1] modified the judgment of the trial court by deleting the award of damages for loss of parental consortium. The judgment was affirmed in all other respects. 784 S.W.2d 88. We reverse that portion of the court of appeals' judgment deleting the damages awarded to Julia Reagan for lost parental consortium and otherwise affirm.

## I. FACTS

David Reagan was involved in a fight with another patron in the parking lot of K–Jacs Saloon in Pasadena, Texas. During the course of the fight, the manager of the bar, Vaughn, struck Reagan on the head with a baseball bat. Reagan suffered a severe brain injury and now functions at the level of a six- or seven-year-old child. Reagan and his minor daughter, Julia, sued Vaughn as well as the owners of K–Jacs, Keith Nichols and Ernest Rosenovac. The jury found that Vaughn, Nichols, and Rosenovac were each 20% negligent and that Reagan was 40% negligent. The jury awarded damages in the amount of $2,432,-000 to Reagan and $405,000 to Julia. ($200,000 for loss of "parental care, nurture and guidance:" $25,000 for mental

anguish in the past and $180,000 for mental anguish in the future). The trial court rendered judgment in conformity with the verdict.

## II. PRIOR DECISIONS

This court has never addressed the issue of whether a child may recover damages for the loss of parental companionship, love, and society when a parent is injured.[2] The courts of appeals of this state that have addressed the issue have refused to allow recovery of such damages on the grounds that only this court or the legislature have the authority to recognize such a cause of action. *See Ramos v. Champlin Petroleum Co.,* 750 S.W.2d 873, 878 (Tex. App.—Corpus Christi 1988, writ denied); *Graham v. Ford Motor Co.,* 721 S.W.2d 554, 555 (Tex.App.—Tyler 1986, no writ); *Hughes Drilling Fluids, Inc. v. Eubanks,* 729 S.W.2d 759, 762 (Tex.App.—Houston [14th Dist.] 1986), *writ granted, judgment set aside and cause remanded for consideration of parties' settlement agreement,* 742 S.W.2d 275 (Tex.1987); *Jannette v. Deprez,* 701 S.W.2d 56, 61 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Bennight v. Western Auto Supply Co.,* 670 S.W.2d 373, 379–80 (Tex.App.—Austin 1984, writ ref'd n.r.e.). The Fifth Circuit has concluded that no such cause of action exists in Texas. *In re Air Crash at Dallas/Fort Worth Airport on August 2, 1985,* 856 F.2d 28, 29 (5th Cir.1988).

In *Sanchez v. Schindler,* we stated that "injuries to the familial relationship are significant injuries and are worthy of compensation." 651 S.W.2d 249, 252 (Tex. 1983); *see also Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex. 1985). *Sanchez* established that a parent has the right to recover damages for the loss of the companionship and society re-

---

**1.** "The phrase 'loss of consortium' is more accurately described as an element of damage rather than a cause of action. But courts have so frequently used the phrase to denote those actions in which loss of consortium is the major element of damage that 'loss of consortium' has come to be referred to as a cause of action." *Whittlesey v. Miller,* 572 S.W.2d 665, 666 (Tex. 1978).

**2.** Julia asserts that a cause of action for lost parental consortium was recognized in *Salinas v. Fort Worth Cab & Baggage Co., Inc.,* 725 S.W.2d 701 (Tex.1987). In *Salinas* we were concerned only with the court of appeals' erroneous finding of no evidence to support the jury's actual damages findings. We were not presented with and did not address the existence of a cause of action for lost parental consortium.

sulting from the death of a child. *Sanchez*, 651 S.W.2d at 254. *Cavnar* established that a child has the right to recover damages for the loss of companionship and society resulting from the death of a parent. *Cavnar*, 696 S.W.2d at 551. Both *Sanchez* and *Cavnar* involved interpretation of the Texas Wrongful Death Act. TEX.CIV.PRAC. & REM.CODE ANN. §§ 71.001–71.011 (Vernon 1986). In the present case, Reagan was not killed; thus our analysis does not include interpretation of the wrongful death statute. Rather, we must decide whether, given our previous recognition of the significance of injuries to the familial relationship,[3] this court should recognize a common law cause of action for loss of consortium damages that result from injury to a parent.[4]

## III. SHOULD THE PARENT–CHILD RELATIONSHIP BE PROTECTED?

■ "The common law is not frozen or stagnant, but evolving, and it is the duty of this court to recognize the evolution." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 309–10 (Tex.1987). "The law is not static; and the courts, whenever reason and equity demand, have been the primary instruments for changing the common law through a continual re-evaluation of common law concepts in light of current conditions." *Whittlesey*, 572 S.W.2d at 668. We fashion our analysis after that in *Whittlesey* and inquire whether the parent-child relationship in our modern society is "as worthy of protection from negligent invasion as are other legally protected interests." *Id.*

In *Sanchez*, we recognized that the death of a child inflicts upon his parents a loss of love, advice, comfort, companionship and society. *Sanchez*, 651 S.W.2d at 251. Likewise, in *Cavnar* we held that a child suffers equivalent losses from the death of a parent. *Cavnar*, 696 S.W.2d at 551. And in *Whittlesey*, we acknowledged that

**3.** We have also recognized a cause of action for lost consortium between spouses where the spouse is injured but not killed. *Whittlesey*, 572 S.W.2d at 668.

**4.** The following courts have recognized a cause of action for loss of parental consortium: *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987); *Villareal v. State*, 160 Ariz. 474, 774 P.2d 213 (1989); *Weitl v. Moes*, 311 N.W.2d 259 (Iowa 1981), *modified by Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf R.R. Co.*, 335 N.W.2d 148 (Iowa 1983); *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 413 N.E.2d 690 (1980); *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981); *Hay v. Medical Center Hosp.*, 145 Vt. 533, 496 A.2d 939 (1985); *Ueland v. Reynolds Metals Co.*, 103 Wash.2d 131, 691 P.2d 190 (1984); *Theama v. City of Kenosha*, 117 Wis.2d 508, 344 N.W.2d 513 (1984); *Nulle v. Gillette–Campbell County Joint Powers Fire Bd.*, 797 P.2d 1171 (Wyo.1990).

It is argued that because a majority of the states do not recognize this cause of action, we should follow suit. "[T]hat is no sufficient reason why an action should not be sustained." *Hill v. Kimball*, 76 Tex. 210, 13 S.W. 59, 59 (1890). This observation remains valid today.

Commentators generally favor recognition of a cause of action for loss of parental consortium. *See* W. PROSSER, THE LAW OF TORTS § 123, at 896 (4th ed. 1971); W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 125, at 936 (5th ed. 1984); HARPER, JAMES & GRAY, THE LAW OF TORTS § 8.8 (May 1988

Supp.); Pound, *Individual Interests in the Domestic Relations*, 14 MICH.L.REV. 177 (1916); *see also* Love, *Tortious Interference with the Parent–Child Relationship; Loss of an Injured Persons' Society and Companionship*, 51 IND.L.J. 590 (1976); Petrilli, *A Child's Right to Collect for Parental Consortium Where Parent is Seriously Injured*, 26 J.FAM.L. 318 (1987–88); Comment, *The Chid's Right to Parental Consortium*, 14 J. MARSHALL L.REV. 341 (1981); Comment, *The Child's Claim for Loss of Consortium Damages; A Logical and Sympathetic Appeal*, 13 SAN DIEGO L.REV. 231 (1975); Comment, *The Child's Cause of Action for Loss of Consortium*, 5 SAN FERN.V.L. REV. 449 (1977); Comment, *Actions for Loss of Consortium in Washington: The Children are Still Crying*, 56 WASH.L.REV. 487 (1981); Note, *The Child's Right to Sue for Loss of a Parent's Love, Care, and Companionship Caused by Tortious Injury to the Parent*, 56 B.U.L.REV. 723 (1976); Note, *Loss of Parental Consortium*, 8 J.JUV.L. 457, 462–63 (1984); Note, *Ipcock v. Gilmore: North Carolina's Refusal to Extend Recovery to the Infant Secondary Tort Victim*, 66 N.C. L.REV. 1337 (1988); Note, *Torts—Loss of Consortium—Right of a Child to a Cause of Action for Loss of Society and Companionship When the Parent is Tortiously Injured*, 28 WAYNE L.REV. 1877 (1982).

The Restatement (Second) of Torts declares that the action should not be recognized. RESTATEMENT (SECOND) OF TORTS § 707A (1977). *But cf. Norwest v. Presbyterian Intercommunity Hosp.*, 652 P.2d 318, 319–20 (Or.1982) (explaining that this section of the Restatement had less than whole-hearted support from the drafters).

nonfatal injury to a spouse can result in a real, direct, and personal loss to the other spouse. 572 S.W.2d at 667. We would be hard pressed to say that a serious, permanent and disabling injury to a parent does not potentially visit upon the child an equally serious deprivation.[5] In the present case, Julia Reagan has been deprived of essentially any opportunity for further parent-child exchange with her father. A child faced with Julia's circumstances can no longer experience the joy of shared experiences with her parent, and she is denied the care, guidance, love, and protection ordinarily provided by her parent. There is no principled reason to accord the parent-child relationship second class status:

> While all family members enjoy a mutual interest in consortium, the parent-child relationship is undeniably unique and the wellspring from which other family relationships derive. It is the parent-child relationship which most deserves protection and which, in fact, has received judicial protection in the past. (citations omitted).
>
> The loss of a parent's love, care, companionship, and guidance can severely impact a child's development and have a major influence on a child's welfare and personality throughout life.

*Villareal v. State*, 160 Ariz. 474, 774 P.2d 213, 217 (1989). The obvious and unquestionable significance of the parent-child relationship compels our recognition of a cause of action for loss of parental consortium.

■ Respondents have suggested that recognition of this cause of action will somehow have the snowball effect of leading to recognition of actions in favor of siblings, grandparents, close friends, and so on. We have little difficulty limiting recovery to the parent-child relationship. We recognize, as did the Wisconsin Supreme Court, that the two relationships likely to be most severely affected by a negligent injury to a person are the husband and wife relationship and that of the parent and child:

> The distinction between the interests of children and those of other relatives is rational and easily applied. Most children are dependent on their parents for emotional sustenance. This is rarely the case with more remote relatives. Thus, by limiting the plaintiffs in the consortium action to the victim's children, the courts would ensure that the losses compensated would be both real and severe.

*Theama*, 344 N.W.2d at 521. Consistent with our prior recognition that adult children may recover for the wrongful death of a parent,[6] we decline to limit the right of recovery under this cause of action to minor children. "Although minors are the group most likely to suffer real harm due to a disruption of the parent-child relationship, we leave this to the jury to consider in fixing damages." *Ueland*, 691 P.2d at 195; *see also Audobon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf Co.*, 335 N.W.2d 148, 152 (Iowa 1983) ("even adult and married children have the right to expect the benefit of good parental advice and guidance") (citing *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 665 (Iowa 1969)).

## IV. SHOULD RECOVERY INCLUDE DAMAGES FOR MENTAL ANGUISH?

Respondents assert that the jury's award of mental anguish damages to Julia violates *Freeman v. City of Pasadena*, in which we held that a stepfather who was not located at or near the scene of an accident involving injury to his stepsons could not recover for negligent infliction of mental anguish. 744 S.W.2d 923 (Tex. 1988).

■ A claim for negligent infliction of mental anguish is separate and distinct from a child's claim for loss of parental

---

5. "This is surely a genuine injury, and a serious one, which has received a great deal more sympathy from the legal writers than from the judges." W. Prosser, The Law of Torts § 125, p. 896 (4th ed. 1971); *see also Berger v. Weber*, 303 N.W.2d 424, 427 (Mich.1981) ("Courts, law review commentators, and treatise writers all recognize that the child suffers a genuine loss").

6. *See Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 635 (Tex.1986).

consortium and loss of consortium does not include an element of mental anguish. *McGovern v. Williams,* 741 S.W.2d 373, 374 (Tex.1987); *Moore v. Lillebo,* 722 S.W.2d 683, 687–88 (Tex.1986). A cause of action for loss of consortium is derivative of the parent's claim for personal injuries. *See Whittlesey,* 572 S.W.2d at 667. In order to recover, the child must prove that the defendant is liable for the personal injuries suffered by her parent, and any defense that tends to constrict or exclude the defendant's liability to the injured parent will have the same effect on the child's consortium action. *See Reed Tool Co. v. Copelin,* 610 S.W.2d 736, 739 (Tex.1981).

On the other hand, a claim for negligent infliction of mental anguish that is not based upon the wrongful death statute requires that the plaintiff prove that he or she was, among other things, located at or near the scene of the accident, and that the mental anguish resulted from a direct emotional impact upon the plaintiff from the sensory and contemporaneous observance of the incident, as contrasted with learning of the accident from others after the occurrence. *Freeman,* 744 S.W.2d at 923–24. Julia has not met either of these requirements and therefore may not recover for mental anguish.

## V. CONCLUSION

 We hold that children may recover for loss of consortium when a third party causes serious, permanent, and disabling injuries to their parent. In order to successfully maintain a claim for loss of parental consortium resulting from injury to the parent-child relationship, the plaintiff must show that the defendant physically injured the child's parent in a manner that would subject the defendant to liability. The child may recover for such non-pecuniary damages as loss of the parent's love, affection, protection, emotional support, services, companionship, care, and society. Factors that the jury may consider in determining the amount of damages include, but are not limited to, the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's rela-

tionship with the parent, the child's emotional and physical characteristics, and whether other consortium giving relationships are available to the child. *See Villareal,* 774 P.2d at 220–21.

Julia Reagan adduced legally sufficient evidence to sustain her claim for lost parental consortium. We therefore reverse that portion of the court of appeals judgment deleting $200,000 damages awarded to Julia for loss of parental consortium and render judgment for Julia in this amount. In all other respects, the judgment of the court of appeals is affirmed.

## OPINION ON MOTION FOR REHEARING

GONZALEZ, Justice.

On motion for rehearing, Vaughn, among other things, requests that we clarify whether this court's holding that a child may recover for loss of consortium when a third party causes serious, permanent and disabling injuries to her parent should be given retrospective or prospective application. There is also confusion as to whether there must be a threshold finding by the finder of fact as to the nature of the injury before the consortium damage issue would be submitted or whether the issue of serious, permanent and disabling injury is to be submitted by the court to a jury by an instruction. Reagan's motion for rehearing is overruled and Vaughn's motion for rehearing is overruled in part and granted in part.

 After this court allowed recovery under the Wrongful Death Statute for loss of consortium for the death of a minor child or parent, respectively, in *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983) and *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), the judgments were applied partially retrospectively by limiting recovery to future causes and those still in the judicial process. In *Sanchez,* this court concluded that considerations of fairness and policy preclude full retroactivity when the court's decision establishes a new principle of law that either

overrules clear past precedent on which litigants may have relied or decides an issue of first impression whose resolution was not clearly foreshadowed. In these wrongful death cases, then, this court reasoned that it was likely that litigants and trial courts had justifiably relied on previous interpretations of damages under the Wrongful Death Act.

Under similar policy considerations, however, this court in *Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978), found that sound administration and fairness required only prospective application for a spouse to recover loss of consortium when the other spouse had been negligently injured by a third party. *See also Minyard Food Stores v. Newman*, 612 S.W.2d 198, 199 (Tex.1981). Prospective application was also applied in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), based on the court's reasoning that litigants and trial courts had faithfully relied upon prior interpretations of comparative causation for strict liability in tort, and it would be unfair to apply the decision retrospectively.

In the case at bar, we announced a new rule of law. The purpose of the new rule is to allow children the same protection allowed spouses when a third party causes serious, permanent, and disabling injuries to their parent. Like these other personal injury cases, past litigants and trial courts have relied upon previous interpretations of recovery for loss of parental consortium so that applying complete retrospective application would subject numerous defendants to claims in cases they previously believed had been finalized.

If we were to apply this holding retroactively to all minors whose claims have not been extinguished by expiration of the statute of limitations, we would open up a pandora's box. Attorneys would be under an ethical duty to find, review and evaluate every personal injury case over the last twenty years in which there are minor children involved to determine if the facts of these old cases came within the purview of *Reagan*. The uncertainty and potential increase in cases would be administratively burdensome on all concerned including the courts. It would also place professional responsibility on lawyers to inform applicable past litigants of the potential cause of action.

Therefore, we declare, as a matter of sound administration and fairness, that this holding shall be applicable only in the present case; those actions arising on or after December 19, 1990; causes of action for loss of parental consortium pending in the courts on December 19, 1990; and causes of action derived from a parent's claim so long as the parent's claim had not been extinguished by settlement, final judgment on appeal, or expiration of the statute of limitations on December 19, 1990.

■ We also note that the cause of action for loss of parental consortium, like the cause of action for loss of spousal consortium is a derivative cause of action. As such, the defenses which bar all or part of the injured parent's recovery have the same effect on the child's recovery. Any percentage of negligence attributable against the parent under Texas' comparative negligence statute will reduce the amount of the child's recovery. *See Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978). In this case, however, the defendants' have waived their claim for this relief by failing to raise this point in their motion for rehearing.

Finally, when the facts are disputed, there must be a threshold finding by the finder of fact that the injury to the parent was a serious, permanent, and disabling injury before the finder of fact determines the consortium damage issue.

Concurring and dissenting opinion on motion for rehearing by HECHT, J., joined by CORNYN, J., and in part by PHILLIPS, C.J.

Concurring and dissenting opinion on motion for rehearing by DOGGETT, J., joined by MAUZY, J.

HECHT, Justice, concurring and dissenting.

Today the Court creates a new personal injury cause of action, holding for the first

time that a person is entitled to money damages for a diminution in parental love, advice, comfort, companionship and society occasioned by tortious injury to the parent. The Court extends this newly allowed recovery to adult as well as minor children, although the only child in this case is a minor. It equivocates on the rather important matter of how seriously a parent must be injured before the child can recover, suggesting at several points in its opinion that recovery may be sought for any injury to a parent, and at other points, including the opinion on rehearing, that the injury must be "serious, permanent, and disabling". On rehearing, the Court considers for the first time the retroactive effect of its decision and partially restricts that effect. The Court never acknowledges the problems its decision poses for the judicial system. Henceforth every person whose parent is, or within any applicable limitations period has been, personally injured—either intentionally, or in a motor vehicle accident, or by a fall, or from using an unreasonably dangerous product, or while receiving medical or health care, or as a result of any other tortious misconduct—has a separate damage claim against the person causing the injuries. In the future, simple personal injury claims cannot be absolutely resolved without the concurrence of the injured person's children. *See Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex.1978). Today's decision is breathtaking in its scope.

For so extreme a change in the common law the Court ought to have some compelling justification, yet I do not find it in the Court's opinion. Rather, the Court poses the rhetorical question—"Should the parent-child relationship be protected?"—and quickly provides the unsurprising affirmative answer. The question is irrelevant and the answer immaterial. Every personal relationship, not just the parent-child relationship, ought to be, in the Court's words, "worthy of protection"; at least the Court does not name the relationships which it thinks are *un*worthy of protection. Yet the Court holds that damages may not be recovered for every loss of consortium, such as between siblings. An affirmative

answer to the Court's question simply does not decide this case. I suspect the Court phrases its inquiry to make its decision as appealing as it can. But rhetoric does not substitute well for reason.

I concur with the Court that damages should not be awarded for a child's mental anguish caused by injury to a parent in these circumstances. I disagree only with the Court's allowance of damages for loss of consortium, which is not justified either by the record in this case or what little analysis there is in the Court's opinion. Good reasons, totally ignored by the Court, strongly support the opposite conclusion. Because I think it is most unwise to allow recovery for loss of parental consortium whenever the parent is injured but not killed, I dissent.

I

If ever there were a case that cried out for recovery for loss of parental consortium, this is not it. The circumstances of David Reagan's injury and any consequent loss to his daughter, Julia, vivify the *in*appropriateness of awarding a person money because his or her parent has been hurt. Brushing facts aside, the Court simply idealizes that "[a] child faced with Julia's circumstances can no longer experience the joy of shared experiences with the parent and is denied the care, guidance, love, and protection ordinarily provided by a parent." *Supra* at 466. The Court is conspicuously vague about what Julia's circumstances are exactly, and about whether the evidence shows that she would have had the sort of relationship with her father, but for his injury, that other children "ordinarily" have. The concurring opinion picks up the Court's refrain, adding that children in Julia's circumstances—not Julia herself, but children *like* Julia—face "sorrow and grief ... on a daily basis." *Supra* at 489. There is absolutely no evidence in the record before us that Julia faces, or has ever faced, sorrow and grief on account of her father's injury. There is some evidence to the contrary.

These panegyrics, while moving as they are no doubt intended to be, have little to

do with the reality of this case. The Court's preference for generalities calls for a recapitulation of the facts here in some detail.

## A

When his wife of some four years filed for divorce, David Reagan left her and their four-year-old daughter, Julia, in Indiana and moved to Houston. Unemployed, the 22-year-old Reagan became a "regular" at K–Jacs Saloon, a beer joint in a "rough" part of town. K–Jacs was owned by Keith Jack Nichols and Ernest Rosenovac, and managed by Lester Gene "Lucky" Vaughn. Vaughn's duties included protecting the barmaids and waitresses from harassment and breaking up fights among the patrons, routine occurrences at K–Jacs and other bars in its neighborhood. Reagan spent two or three nights a week at K–Jacs during the three months he stayed with his sister. Vaughn testified that he had seen Reagan in the bar on several prior occasions and that Reagan seemed like a nice kid.

On Friday, the thirteenth of June, Reagan arrived at K–Jacs early, about 3:30 or 4:00 p.m. One of the waitresses, Elizabeth "Tina" Lamb, testified that Reagan said he was very upset because he was about to return to Indiana to finish up his divorce. He began drinking immediately, Lamb stated, and continued to drink heavily throughout the evening, roaming around in the bar, increasingly intoxicated and increasingly violent. Reagan stayed until K–Jacs closed at 2:00 a.m. Nearly three hours later his blood alcohol level was .226 gm/dl, more than twice the level for legal intoxication.[1]

Richard Lepper testified that he noticed while talking with Reagan during the evening that Reagan was unstable. Concerned that Reagan was in no condition to be driving, Lepper said he offered to take Reagan to get something to eat and then home. Lepper stated that as he and Reagan were walking out across the parking lot, Reagan stopped to talk to two girls in a car. When they drove off, Lepper said, Reagan got into an argument with three cowboys who were standing nearby. Lepper, who had been stabbed on the K–Jacs parking lot on a separate occasion, testified that he begged Reagan to leave, but the argument turned into a scuffle, and when he tried to pull Reagan away from the others, Reagan turned, enraged, and began to fight like a wild man.

About that time Ronnie Di Simone and his wife, Donna, were also leaving K–Jacs. They had been to a movie earlier in the evening and had stopped by on the way home. Di Simone testified that as he walked out of the bar he saw Reagan, whom he had seen at K–Jacs on prior occasions, grabbing through the open window of a car at a man inside and shouting, "I'm going to whip your ass." Di Simone said that he walked over to Reagan and tried to persuade him to leave, but Reagan whirled around and said, "If I can't whip him, I'm going to whip you." Di Simone said that Reagan hit him, and the two began to fight. After a few minutes, Di Simone stated, Vaughn came out of the bar and separated them, telling them that he had called the police and that they had better go home. Vaughn testified that he was cleaning up in the bar after it closed when he was told that there was fighting outside. He stated that he told one of the bartenders to call the police, went outside and stopped the fight, and then returned inside. Several spectators verified that Vaughn warned everyone to leave and told them that the police were on their way.

Reagan, however, was wild-eyed and uncontrollable, according to Di Simone, and came at him again. Vaughn testified that when he heard that Reagan and Di Simone were still fighting, he again instructed an employee to call the police and went outside to break them up. This time, Vaughn stated, he grabbed Reagan, threw him on the ground, and sat on him until Reagan promised he would go home if Vaughn would let him up. Di Simone stated that

---

1. *See* Tᴇx.Rᴇv.Cɪv.Sᴛᴀᴛ.Aɴɴ. arts. 6701*l*–1 (Vernon Supp.1990); Tᴇx.Pᴀʀᴋs & Wɪʟᴅʟɪғᴇ Cᴏᴅᴇ § 31.097.

he tried to walk away while Vaughn pinned Reagan on the ground, but that as soon as Reagan got up he came at Di Simone again. Di Simone testified that Reagan shouted that "he was in a fighting mood and he was going to whip some son-of-a-bitch".

Vaughn testified that having failed in his efforts to separate Reagan and Di Simone, he went inside K–Jacs, instructed one of the waitresses again to call the police, retrieved a baseball bat he kept under the bar, and went back outside. By this time Reagan and Di Simone had been fighting off and on for nearly half an hour. Several witnesses testified that as Vaughn tried again to break up the pair, Di Simone hit Reagan so that he fell, striking his head against a concrete curb on the parking lot. Reagan got up and lunged, screaming, at Vaughn who was using the baseball bat to push Di Simone away. Lamb and another K–Jacs waitress, Diane Jackson, who were watching the fight, testified that Vaughn was only trying to settle the two down. But Reagan, Lamb stated, would not stop cursing and fighting. Another onlooker, Ronnie McFadden, testified that Reagan was fighting as if he were not afraid of anything.

As to some of the details of the events of the evening the recollections of the witnesses vary. But every witness present testified that when Reagan came up behind Vaughn, someone yelled that there was a knife. Waitresses Lamb and Jackson heard it, although they did not see anyone with a knife. McFadden heard someone shout, "Look out, Lucky, he's got a knife!" Don Morgan, a K–Jacs patron who was still inside the bar, heard the same thing. Neither McFadden nor Morgan actually saw a knife. However, Vaughn, Di Simone and Di Simone's wife all testified that they not only heard the shout but saw a knife in Reagan's hand. Henry Willis, a passerby who drove into the parking lot to see what was happening, also heard the same outcry and saw Reagan with a knife.

As soon as someone yelled that there was a knife, Di Simone kicked at Reagan, and as he did, Vaughn turned and swung the bat, hitting Reagan in the side of the head. Reagan fell to the ground motionless. Vaughn and several others immediately loaded Reagan into a vehicle to take him to the hospital. When the police arrived at 2:44 a.m., the parking lot was clear. The knife, if there was one, was never found.

As a result of his injury, Reagan suffered serious, permanent, debilitating brain damage. Although he is able to care for himself in many respects, he cannot function as an adult. A physician testified at trial that Reagan behaves much like a six-year-old child and will never significantly improve.

### B

The only evidence of the nature of the relationship between Reagan and his daughter, Julia, is the testimony of Reagan's two sisters, Geneva Dale Showalter and Donita Cooper. Neither Julia, who was eleven years old at the time of trial, nor her mother, Tressa, appeared at trial or offered testimony. Reagan appeared but did not testify.

Cooper testified that Reagan married Tressa when he was seventeen and joined the army a few months later while she was still pregnant. Cooper stated that Reagan was stationed not far from where Tressa and Julia lived, and that he would see his daughter sometimes on weekends. Reagan was, his sister said, an affectionate father. Reagan was discharged from active duty when his daughter was about three years old, and soon thereafter Tressa filed for divorce. Tressa was working at the time because Reagan could not find a job, and Reagan sometimes stayed with his daughter while her mother was at work. Within a year, however, Reagan left Tressa and Julia and moved to Houston. Cooper testified that the week Reagan was injured she heard him talking to his daughter on the phone, telling her that he missed her too much and was moving back to Indiana.

Showalter testified that when she heard Reagan had been injured, she went from her home in Indiana to visit him in the hospital in Houston. Neither Tressa nor Julia ever visited or called Reagan during

the several weeks he was in the hospital. Showalter said that after she returned to Indiana and told Tressa what had happened, Tressa took Julia and moved away from Indiana without telling Reagan or his family where they were going. Showalter eventually discovered that Tressa had taken Julia to Florida and remarried. Showalter recalled that once when Reagan attempted to call his daughter in Florida, Tressa's new husband came on the phone and told Reagan never to do so again.

After convalescing in Houston, Reagan returned to Indiana to live with his parents. He did not see his daughter or talk to her while she lived in Florida. At some later date Tressa and Julia returned to Indiana and settled in a town about thirty miles from Reagan's parents' home. Showalter testified that Reagan sees his daughter occasionally when she visits in Showalter's home, that she still loves him, that they sometimes watch television together but do not talk or play, and that Julia is embarrassed by the situation. Reagan's sisters testified that Reagan sometimes cries when he thinks of his daughter.

What evidence there is regarding the relationship between Reagan and his daughter now or at any time, almost all of it pertains to how Reagan thinks of Julia. The only evidence in this record of how Julia thinks of Reagan is the following testimony by Showalter:

Q. Does she [Julia] ever talk to you about David?

A. Yes. I have tried to explain David's condition to her. Julia's a quiet child so she doesn't ask a lot of questions and it's hard for her to understand. I think she's embarrassed—I mean, she loves David, but she's embarrassed by the situation.

. . . . .

Q. Does she ever come to him with her problems? Can she tell him her problems and he help her out, give her any guidance?

A. Not really, you know, like you or I would do. He did take some candy away from her before dinner, which upset her.

Q. Does she ever talk to you about how she feels about David?

A. Well, she doesn't want to say anything to hurt my feelings about David. I know she's embarrassed by the condition from talking to her mother. And she—when I talk to her about it, you know, she tells me she understands but we're talking about an 11–year–old child here. I mean, she loves him but, you know—well, you can imagine if it was your father with your other friends and stuff. I don't know how to explain it to you except to say that.

### C

Six weeks after his injury Reagan sued Vaughn and K–Jacs' co-owner Nichols. Reagan alleged that Vaughn was negligent in hitting him with the bat, and that Nichols was liable for Vaughn's conduct as his employer. Sometime later Vaughn was charged with aggravated assault and acquitted by a jury. Reagan eventually added Rosenovac, Nichols' partner, as a defendant, and alleged that the two of them were negligent in hiring Vaughn and in failing to provide trained security personnel at their beer joint. More than seven years after filing suit, and about three weeks before this case finally came to trial, Reagan amended his petition to name as a plaintiff for the first time his daughter Julia through her mother, Tressa Arnette, as next friend.

The jury found that Reagan, Vaughn, Nichols and Rosenovac were all negligent in causing Reagan's injury. The jury attributed 40% of that negligence to Reagan himself, and 20% each to Vaughn, Nichols and Rosenovac. The jury did not find any of the defendants to have been grossly negligent. The jury assessed fair and reasonable compensation for Reagan's injuries, past and future, at $2,432,000.00.[2] The jury found Julia's damages as follows:

---

**2.** Reagan's attorney argued to the jury that they should "shoot for something right around $4–½ million." The jury assessed Reagan's damages

as follows: past loss of earning capacity, $85,-000; future loss of earning capacity, $750,000; past medical expenses, $45,000; future medical

| | |
|---|---|
| Parental support in the past | –0– |
| Parental support in the future | –0– |
| Loss of parental care, nurture and guidance from David Reagan as a result of the injuries and disability suffered by David Reagan in the incident | $200,000.00 |
| Mental anguish in the past | $ 25,000.00 |
| Mental anguish which Julia Reagan will, in reasonable probability, suffer in the future | $180,000.00 |
| TOTAL | $405,000.00 |

The trial court rendered judgment on the verdict, awarding Reagan $1,459,200.00, calculated to be the amount of his actual damages found by the jury reduced by 40%, the percentage of negligence attributed to him. The trial court awarded Julia the entire $405,000.00 found by the jury, not reduced by the percent of Reagan's negligence.

The court of appeals affirmed the judgment as to Reagan.[3] It reversed the judgment in favor of Julia, however, holding that while the evidence was factually and legally sufficient to support the jury's damage findings for her, the law did not provide a basis for her to recover those damages. The appeals court suggested that it did not agree with a legal prohibition against such recovery, but that it was not authorized to change the law. One justice dissented, stating that he would allow recovery by Julia and affirm the judgment of the trial court in its entirety. 784 S.W.2d 88.

## II

The Court's decision today is well outside the mainstream of the common law which for centuries has restricted recovery of damages for tortious injury to personal relationships to very limited circumstances. Not until the past decade has any American jurisdiction extended that recovery to include loss of consortium for bodily injury to a parent. Only a very small minority of jurisdictions, at most three and perhaps only one, appear to have wandered so far as the Court does today.

### A

Like many areas of the law, the right to recover damages for loss of consortium has not followed a strictly logical course of development. Generally speaking, however, the existence of the right has depended upon the nature of the relationship and whether the injury to it is direct or indirect.

Very early on the common law recognized a master's right of action to recover for a loss of services resulting from a tortious injury to his servant. W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 125, at 931 (5th ed. 1984) [hereinafter PROSSER & KEETON]. Inasmuch as servants were then considered rather like chattels, and the master's recovery was limited to economic losses, the action was more in the nature of a claim for property damage than for impairment of relationship. By 1619, according to Prosser and Keeton, the principle underlying the master's cause of action had been applied to allow a husband to recover for the loss of his wife's services caused by a third party. PROSSER & KEETON § 124, at 916, and § 125, at 931. Eventually, following the same rationale although somewhat more reluctantly, the law also came to recognize the right of a father to recover for the lost services of a child. PROSSER & KEETON § 124, at 924–25.

expenses, $30,000; past supervisory care, $42,000; future supervisory care, $900,000; past physical pain, $30,000; future physical pain, $0; past mental anguish, $50,000; future mental anguish, $250,000; past physical impairment, $250,000; future physical impairment, $0; past physical disfigurement, $0; future physical disfigurement, $0.

3. In this Court defendants complain that the court of appeals erred in overruling their points of error. The Court does not address these contentions made in defendants' application for writ of error. I would hold that defendants' complaints are without merit.

Actionable injury to the marital or filial relationship might be direct or indirect. Injury was direct when the wife or child was either forced or induced by a stranger to the relationship to contravene the obligations of the relationship. Actions for such direct, intentional injury included abduction, enticement, seduction, criminal conversation, and much later, alienation of affection. PROSSER & KEETON § 124. Indirect injury occurred when the wife or child was injured so that the marital or filial role was impaired. PROSSER & KEETON § 125.

Whether the actionable injury was direct or indirect, recovery was limited at first to economic losses. Much later, and only more recently, the concept of lost services expanded to include injury to the intangible and emotional affection and society involved in the relationship, and the sexual aspect of the marital relationship, together referred to as "consortium".[4] *Id.;* RESTATEMENT OF TORTS § 693 (1938); RESTATEMENT (SECOND) OF TORTS § 693 comment c (1977); Holbrook, *The Change in the Meaning of Consortium,* 22 MICH.L.REV. 1, 2 (1923); Pound, *Individual Interests in the Domestic Relations,* 14 MICH.L.REV. 177, 183 n. 18, 188–89 (1916); *see* Annotation, *Husband's Right to Damages for Loss of Consortium Due to Personal Injury to Wife,* 21 A.L.R. 1517 (1922), 133 A.L.R. 1156 (1941). A husband's loss of spousal consortium thus came to be recognized as compensable under the common law, whether the loss was caused by direct or indirect injury to the marital relationship. The common law also recognized a father's right to recover for loss of filial consortium caused by certain direct injuries to his relationship with his child, excluding alienation of affections, but it did not extend that recovery, as for loss of spousal consortium, to indirect injuries to the relationship. PROSSER & KEETON § 124, at 924–29, and § 125, at 934–35; RESTATEMENT OF TORTS §§ 699–707 (1938); RESTATEMENT (SECOND) OF TORTS §§ 699–707 (1977).

The common law did not extend to wives and mothers the recovery for loss of consortium afforded husbands and fathers, principally because married women were subject to legal disabilities and were not legally entitled to the service of their husbands and children. With the statutory removal of those disabilities came the recognition that women should have the same rights as men to sue for loss of consortium. PROSSER & KEETON § 124, at 916–17; RESTATEMENT OF TORTS § 690 comment a (1938); RESTATEMENT (SECOND) OF TORTS § 683 comment d (1977). At first wives were limited to recovery for direct injury to the marital relationship. *See* RESTATEMENT OF TORTS §§ 690, 693 (1938). Not until as recently as 1950 did any American jurisdiction permit a wife to recover for loss of consortium caused by tortious, bodily injury to her husband. PROSSER & KEETON § 125, at 931–32; RESTATEMENT OF TORTS § 695 (1938); RESTATEMENT (SECOND) OF TORTS § 693 comment d (1977); Annotation, *Wife's Right of Action for Loss of Consortium,* 36 A.L.R.3d 900 (1971). By 1969, when the American Law Institute tentatively adopted section 693 of the Restatement (Second) of Torts, recognizing a cause of action by either spouse, it was still the minority rule in the United States. RESTATEMENT (SECOND) OF TORTS Appendix to § 693, at 515 (1981).[5] Today most states follow the rule in section 693, although a few still do not. PROSSER & KEETON § 125, at 932.[6] Concurrently, the right to recover

4. The word "consortium" has various meanings, as the authorities cited reflect. I use it here, as the Court does today, to refer generally to the non-economic, emotional or intangible aspects of a personal relationship.

5. Section 693 states in pertinent part: "One who by reason of his tortious conduct is liable to one spouse for illness or other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse, including impairment of capacity for sexual intercourse, and for reasonable expense incurred by the second spouse in providing medical treatment."

6. Prosser and Keeton list Virginia and Kansas as two states which do not allow an action for loss of consortium caused by personal injury to a spouse. PROSSER & KEETON § 125, at 932 n. 10, *citing Floyd v. Miller,* 190 Va. 303, 57 S.E.2d 114 (1950); *Taylor v. S.H. Kress & Co.,* 136 Kan. 155, 12 P.2d 808 (1932). *See also Shuder v. McDonald's Corp.,* 859 F.2d 266, 273 n. 4 (3rd Cir.1988) (parties stipulate no recovery for loss of consortium under Virginia law);

loss of consortium for direct injury to the marital relationship has been abolished by statute in most American jurisdictions. PROSSER & KEETON § 124, at 929–30.

The common law did not allow recovery for loss of parental consortium under any circumstances, whether the injury to the relationship was direct or indirect. PROSSER & KEETON § 124, at 929, and § 125, at 935; RESTATEMENT (SECOND) OF TORTS § 707A (1977). This appears to have been due, at least in part, to the fact that the common law imposed upon a parent no legal duty to support a child, and thus the child had no right to parental support or society which injury to the parent could impair. *See* Pound, *supra,* at 183–86. Loss of parental consortium has been allowed, however, in wrongful death cases. Historically, the common law did not recognize a cause of action for wrongful death. PROSSER & KEETON § 127, at 945–46; S. SPEISER, RECOVERY FOR WRONGFUL DEATH §§ 1:1–1:2 (2d ed. 1975). The action was first created in England by the passage of Lord Campbell's Act in 1846. PROSSER & KEETON § 127, at 945; S. SPEISER, *supra,* § 1:8. Soon afterward American legislatures began to follow suit, and currently all states have statutes allowing recovery for wrongful death, usually by the decedent's spouse, children and parents. PROSSER & KEETON § 127, at 945–46; S. SPEISER, *supra,* § 1:9. At first most of these statutes were construed to limit recovery to economic losses, but in later years, mostly since the 1950's, some courts and legislatures have allowed damages for loss of consortium to all statutory beneficiaries, children as well as parents and spouses. *See* PROSSER & KEETON § 127, at 949–54; S. SPEISER, *supra,* §§ 3:1, 3:49; 3 A PERSONAL INJURY §§ 3.06–3.07 (L. Frumer & M. Friedman ed. 1989); RESTATEMENT (SECOND) OF TORTS § 925 comments b, e (1979). Now a majority of states allow recovery for loss of consortium—spousal, filial and parental—in wrongful death actions, either by statute or caselaw; a substantial minority, however, still do not. PROSSER & KEETON § 127, at 951–53; S. SPEISER, *supra,* § 3.49;

*Hoffman v. Dautel,* 192 Kan. 406, 388 P.2d 615 (1964) (wife has no cause of action for loss of

3A PERSONAL INJURY §§ 3.06–3.07 (L. Frumer & M. Friedman ed. 1989); RESTATEMENT (SECOND) OF TORTS § 925 comments b, e (1979).

In sum, it may fairly be said that prior to 1950 the common law did not as a rule allow a person to recover money damages for loss of consortium except in an action by a husband for direct or indirect injury to the marital relationship, and in an action by a father for certain direct injuries to a filial relationship. Since 1950, most states in this country have not extended this limited right of recovery for loss of consortium except to give women the same rights as men and to permit recovery by statutory beneficiaries in wrongful death actions. During the same period most states have limited the right further by abolishing actions for direct injury to the marital relationship.

B

Texas has, before today, followed the rules regarding recovery for loss of consortium adopted in a majority of other jurisdictions. Not until the early 1970's did this Court recognize the right to recover for loss of consortium for direct injury to the marital relationship. *See Felsenthal v. McMillan,* 493 S.W.2d 729 (Tex.1973) (criminal conversation); *Kelsey–Seybold Clinic v. Maclay,* 466 S.W.2d 716 (Tex.1971) (alienation of affections). As in other states, such actions have now been abolished by statute. TEX.FAM.CODE §§ 4.05, 4.06.

Before 1978 this Court had not expressly recognized a cause of action for loss of consortium caused by bodily injury to another. In *Whittlesey v. Miller,* 572 S.W.2d 665 (Tex.1978), the Court held that a wife could recover for loss of consortium resulting from a third party's negligent injury of her husband in an automobile accident. The Court noted that "[t]he husband's right to recover for the negligent impairment of consortium ... existed at common law," and that section 693 of the Restatement (Second) of Torts, allowed such recov-

consortium resulting from injury to husband); *cf.* KAN.STAT.ANN. § 23–205.

ery by both spouses. *Id.* at 666–67. The Court stressed that its holding aligned Texas with the majority of jurisdictions in this country. *Id.* at 668.[7]

The Court next allowed recovery for loss of consortium in wrongful death cases. In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex. 1983), the Court abandoned the pecuniary loss rule and allowed parents to recover damages for loss of filial consortium resulting from the death of their son under the Wrongful Death Act.[8] The Court observed that recovery of filial consortium was analogous to recovery of spousal consortium allowed in *Whittlesey.* The Court also emphasized, however, that a majority of other states had already abandoned the pecuniary loss rule in wrongful death cases. *Id.* at 252–53. Two years later in *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), the Court expressly held what it had intimated in *Sanchez,* that recovery for loss of parental and spousal consortium was also permitted in wrongful death actions. *Id.* at 551.

Thus, Texas law allowing damages for loss of consortium has followed developments in most other states, until today. The Court has refused to disturb the consistent rulings of the courts of appeals disallowing recovery for loss of parental consortium caused by nonfatal injury to a parent. *Ramos v. Champlin Petroleum Co.,* 750 S.W.2d 873, 878 (Tex.App.—Corpus Christi 1988, writ denied); *Hughes Drilling Fluids, Inc. v. Eubanks,* 729 S.W.2d 759, 762 (Tex.App.—Houston [14th

Dist.] 1986), *vacated by agreement of the parties,* 742 S.W.2d 275 (Tex.1987); *Bennight v. Western Auto Supply Co.,* 670 S.W.2d 373, 379–80 (Tex.App.—Dallas 1984, writ ref'd n.r.e.); *cf. Graham v. Ford Motor Co.,* 721 S.W.2d 554, 555 (Tex.App.—Tyler 1986, no writ). The Fifth Circuit has concluded that Texas law does not allow recovery for loss of parental consortium due to nonfatal injuries. *In re Air Crash at Dallas/Fort Worth Airport,* 856 F.2d 28, 29 (5th Cir.1988). Likewise, this Court has never allowed recovery for loss of filial consortium caused by nonfatal injuries.[9]

### .C

Section 707A of the Restatement (Second) of Torts states: "One who by reason of his tortious conduct is liable to a parent for illness or other bodily harm is not liable to a minor child for resulting loss of parental support and care." RESTATEMENT (SECOND) OF TORTS § 707A (1977). This provision and section 693 were both tentatively adopted by the American Law Institute in 1969. The Court alludes to the fact that section 707A was recommended "with some reluctance on the part of several of the drafting group, and under compulsion of the case law." AMERICAN LAW ·INSTITUTE, RESTATEMENT (SECOND) OF TORTS TENT. DRAFT NO. 14, at 28 (1969). *Supra* at 474 n. 4. What the Court omits is that section 707A was reported by Professor William Prosser and adopted without opposition at a general session of the American Law Institute.[10]

---

7. The Court also stated that its holding "corrects a paradox in the law of this state in that heretofore the marital relationship has been protected from only intentional invasions", *i.e.,* by actions for criminal conversation and alienation of affections. *Whittlesey,* 572 S.W.2d at 668. Now that both actions have been abolished by statute, the paradox is that the law still protects against indirect injury to the marital relationship but no longer protects against direct injury.

8. TEX.CIV.PRAC. & REM.CODE §§ 71.001–71.011, formerly Tex.Rev.Civ.Stat.Ann. arts. 4571–4578.

9. In *Hall v. Birchfield,* 718 S.W.2d 313 (Tex.App. —Texarkana 1986), *rev'd on other grounds,* 747 S.W.2d 361 (Tex.1987), the appeals court stated that "damages to the filial relationship are com-

pensable." 718 S.W.2d at 338. The appeals court affirmed a judgment awarding a father and mother $1,000 each for mental anguish suffered on account of their daughter's blindness due to retrolental fibroplasia. It appears that those damages were also recoverable because of the shock suffered by the parents when their physician first told them that their daughter was blind. *See* 718 S.W.2d at 337; *see also Freeman v. City of Pasadena,* 744 S.W.2d 923 (Tex.1988); *Jannette v. Deprez,* 701 S.W.2d 56, 61 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Thus, the language allowing recovery for loss of filial consortium was dicta.

10. The following brief colloquy was the only discussion by the members of the American Law Institute preceding the adoption of section 707A:

The first state to depart from the rule of section 707A was Massachusetts, in 1980. *Ferriter v. Daniel O'Connell's Sons, Inc.,* 381 Mass. 507, 413 N.E.2d 690 (1980).[11] Since then, eight other states have followed suit. *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424 (1981); *Weitl v. Moes,* 311 N.W.2d 259 (Iowa 1981), *modified and overruled in part, Audubon–Exira Readymix, Inc. v. Illinois Cent. Gulf R.R.,* 335 N.W.2d 148 (Iowa 1983); *Theama v. City of Kenosha,* 117 Wis.2d 508, 344 N.W.2d 513 (1984); *Ueland v. Reynolds Metals Co.,* 103 Wash.2d 131, 691 P.2d 190 (1984); *Hay v. Medical Center Hosp. of Vt.,* 145 Vt. 533, 496 A.2d 939 (1985); *Hibpshman v. Prudhoe Bay Supply, Inc.,* 734 P.2d 991 (Alaska 1987); *Villareal v. State Dep't of Transp.,* 160 Ariz. 474, 774 P.2d 213 (1989); *Nulle v. Gillette–Campbell County Joint Powers Fire Bd.,* 797 P.2d 1171 (Wyo.1990). Of these nine states, three have expressly limited recovery to cases in which the parent sustained very serious injuries. *Weitl,* 311 N.W.2d at 270 (recovery only when "significant disruption or diminution" of the relationship is shown); *Hay,* 496 A.2d at 946 (recovery only "when the parent has been rendered permanently comatose"); *Villareal,* 160 Ariz. at 480, 774 P.2d at 219 ("We limit our holding to allow loss of consortium claims only when the parent suffers serious, permanent, disabling injury rendering the parent unable to provide love, care, companionship, and guidance to the child. The parent's mental or physical impairment must be so overwhelming and severe that the parent-child relationship is destroyed or nearly destroyed."). Only one state has refused this limitation on recovery. *Berger,* 303 N.W.2d at 427. All but three states have limited recovery to minor, or at least dependent, children.[12] *See id.; Audubon–Exira,* 335 N.W.2d at 152: *Ueland,* 691 P.2d at 195.

The Court acknowledges that it does not follow the rule adopted in a majority of states. What the Court does not say is that the rule it adopts has been expressly rejected by courts in twenty-seven states, decisions in twenty-one of which were in the past decade, and in the District of Columbia. *Gray v. Suggs,* 292 Ark. 19, 728 S.W.2d 148 (1987); *Lewis v. Rowland,* 287 Ark. 474, 701 S.W.2d 122 (1985); *Borer v. American Airlines,* 19 Cal.3d 441, 138 Cal. Rptr. 302, 563 P.2d 858 (1977), *cited in Nix v. Preformed Line Products Co.,* 170 Cal. App.3d 975, 216 Cal.Rptr. 581 (1985), *and Ledger v. Tippitt,* 164 Cal.App.3d 625, 210 Cal.Rptr. 814 (1985); *Lee v. Colorado Dep't of Health,* 718 P.2d 221 (Colo.1986); *Hinde v. Butler,* 35 Conn.Sup. 292, 408 A.2d 668 (1979) (wrongful death action;

---

DEAN PROSSER: Well, I gather that nobody wants to reverse the position of 707A and allow the child to recover for loss of the equivalent of consortium when the father or mother is personally injured. One federal case in Hawaii did that once, and presently got reversed when the state law changed, and all of the cases have refused to allow recovery, so we would have no case support whatever for taking the position that the action would lie.

I don't hear any voices uplifted in favor of reversing 707A, so I would assume that it is approved, and proceed.

PRESIDENT DARRELL: Is there any comment on 707A?

MR. ELDREDGE: I move its adoption.

PRESIDENT DARRELL: Maybe it isn't necessary. There is no opposition to it, so we will assume that it is approved tentatively. AMERICAN LAW INSTITUTE, 1969 JOURNAL OF PROCEEDINGS 179.

11. *Ferriter* held that neither a worker's failure to give notice, nor his acceptance of worker's compensation benefits, precluded his spouse and children from recovering on their independent common law claims for loss of consortium. Massachusetts, then and now, has an "unusual" worker's compensation statute, which allows a worker to elect either his common law remedies or worker's compensation benefits. Mass. Gen.L. ch. 152, § 24. *Ferriter,* 413 N.E.2d at 700. The Massachusetts Legislature, however, "has since nullified the *Ferriter* decision by preventing recovery for loss of consortium by spouses or children of employees subject to the provisions of the Workers' Compensation Act. G.L. c. 152 § 124, as amended St.1985, c. 572, § 35." *Corrigan v. Gen. Elec. Co.,* 406 Mass. 478, 548 N.E.2d 1238, 1240 (1990). Under the amended version of the statute, a worker's failure to give notice of election of his common law remedies also waives common law loss of consortium claims by his spouse and children.

12. Massachusetts appears to require that a child be "dependent" to recover, whether the child is a minor or not. *See Mendoza v. B.L.H. Electronics,* 403 Mass. 437, 530 N.E.2d 349, 350 (1988).

loss of consortium is an element of a marital relationship and cannot be extended to children); *Pleasant v. Washington Sand & Gravel Co.,* 262 F.2d 471 (D.C.Cir.1958); *Zorzos v. Rosen,* 467 So.2d 305 (Fla.1985), *citing Clark v. Suncoast Hosp., Inc.,* 338 So.2d 1117 (Fla. 2d DCA 1976); *W.J. Bremer Co. v. Graham,* 169 Ga.App. 115, 312 S.E.2d 806 (1983); *Halberg v. Young,* 41 Haw. 634, 59 A.L.R.2d 445 (1957); *Green v. A.B. Hagglund & Soner,* 634 F.Supp. 790 (D.Idaho 1986) (applying Idaho law); *Huter v. Ekman,* 137 Ill.App.3d 733, 92 Ill.Dec. 369, 484 N.E.2d 1224 (1985), *cited in Dralle v. Ruder,* 124 Ill.2d 61, 124 Ill.Dec. 389, 529 N.E.2d 209 (1988); *Dearborn Fabricating & Eng'g Corp. v. Wickham,* 551 N.E.2d 1135 (Ind.1990); *Schmeck v. City of Shawnee,* 231 Kan. 588, 647 P.2d 1263 (1982) (parent's suit for injury to child), *citing Hoffman v. Dautel,* 189 Kan. 165, 368 P.2d 57 (1962); *Kelly v. United States Fidelity & Guar. Co.,* 353 So.2d 349 (La. App.1977), *appeal dism'd as moot,* 357 So.2d 1144 (La.1978); *Hickman v. Parish of E. Baton Rouge,* 314 So.2d 486 (La. App.), *writ denied* 318 So.2d 59 (La.1975); *Durepo v. Fishman,* 533 A.2d 264 (Me. 1987); *Gaver v. Harrant,* 316 Md. 17, 557 A.2d 210 (1989); *Salin v. Kloempken,* 322 N.W.2d 736 (Minn.1982); *Barbera v. Brod-Dugan Co.,* 770 S.W.2d 318 (Mo.Ct.App. 1989); *Hoesing v. Sears Roebuck & Co.,* 484 F.Supp. 478 (Dist.Neb.1980) (applying Nebraska law); *General Elec. Co. v. Bush,* 88 Nev. 360, 498 P.2d 366 (1972); *Russell v. Salem Transp. Co.,* 61 N.J. 502, 295 A.2d 862 (1972); *DeAngelis v. Lutheran Medical Center,* 84 A.D.2d 17, 445 N.Y.S.2d 188 (1981), *aff'd,* 58 N.Y.2d 1053, 462 N.Y.S.2d 626, 449 N.E.2d 406 (1983); *Vaughn v. Clarkson,* 324 N.C. 108, 376 S.E.2d 236 (1989) (per curiam); *Morgel v. Winger,* 290 N.W.2d 266 (N.D.1980); *Sanders v. Mt. Sinai Hosp.,* 21 Ohio App.3d 249, 487 N.E.2d 588 (1985); *Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or. 543, 652 P.2d 318 (1982); *Steiner v. Bell Tel. Co.,* 358 Pa.Super. 505, 517 A.2d 1348 (1986), *aff'd without opinion,* 518 Pa. 57, 540 A.2d 266 (1988); *Turner v. Atlantic Coastline Ry.,* 159 F.Supp. 590 (N.D.Ga. 1958) (applying South Carolina law); *Still v. Baptist Hosp.,* 755 S.W.2d 807 (Tenn.Ct. App.1988). By extending recovery to minors the Court adopts a rule rejected in thirty-three jurisdictions and adopted in only three. By failing to unambiguously limit recovery to cases involving very serious parental injuries, the Court aligns itself with exactly one other state in the country, Michigan.

## III

With a few sentences in a footnote, the Court dismisses the fact that its decision today is the view of only a very small minority of American jurisdictions, adding lamely that it need not follow a rule just because the great majority of other states do. Of course, the validity of the Court's decision cannot be judged merely by counting the other jurisdictions that would seem to agree or disagree. The Court's position today is misguided, not simply because its adherents are few, although they certainly are, but for the very good reasons its adherents are few. The Court ignores these reasons and relies instead on analysis that is feeble and flawed.

### A

The Court attempts to base its decision upon the fact that the common law is changing, that the parent-child relationship is worthy of protection, and that loss of consortium damages are allowed in other settings. Each of these facts is true; but, as will be shown, none supports the conclusion the Court reaches. Without support in law or logic, the Court's decision is not a natural development in the law but an anomaly.

#### 1

The Court attempts to premise its analysis upon the proposition that the common law is ever developing and subject to reexamination in light of changing conditions. *Supra* at 465–466. This proposition, though true, proves nothing. The common law's fluvial course is altered by the naturally changing contours of the society through which it flows. It can also be diverted artificially. It does not follow log-

ically from the fact that the course of the law *can* change that it *should* change in any particular case. And it cannot be determined from the mere fact that the common law does change, as it has today, whether its course was altered legitimately because of changing conditions, or simply by contrivance. That determination depends upon an analysis of current conditions which is noticeably lacking in the Court's opinion.

Certainly, there has not been much change in the law itself. As noted above, few states have deviated from the rule so as to cast much doubt upon its continued validity. The Court nevertheless argues that "[c]ommentators generally favor recognition of a cause of action for loss of parental consortium." *Supra* at 465 n. 4. In support of this perception of a changing trend in the law the Court cites articles by seven law students written over a period of twice as many years, articles of similar vintage by two lawyers and two professors, an article written by Roscoe Pound in 1916, and three recognized treatises. I would not ordinarily expect the highest court of a state to rely quite so heavily on the views of a few law students, lawyers and professors in law review articles in deciding to reject the considered views of the courts of other states. In citing the bulk of these materials the Court appears to be groping for whatever support it can find. Dean Pound's incisive article sheds some light on the issues in this case; but it certainly does

not endorse the result the Court reaches today. To the contrary, I would say that Dean Pound expressed seventy-five years ago some of the same reservations about allowing recovery for loss of parental consortium which still persuade a majority of courts.[13] The treatises the Court cites certainly do not criticize the minority rule it follows, but they do stop short of actually "favor[ing] recognition of a cause of action for loss of parental consortium." Perhaps the weakness of this commentary accounts for the Court's failure to point to a single sentence that is very helpful. In any event, weighed against these academic views must be the contrary opinions of the majority of state judiciaries that have passed on the issue.

There also does not appear to have been much if any change in the nature of family relationships in what the Court calls "our modern society" to warrant recognizing recovery for loss of parental consortium for the first time. The significance of the parent-child relationship is, as the Court states, "obvious and unquestionable". *Supra* at 466. But this fact is hardly a recent discovery. Surely we cannot claim to have attained a more enlightened appreciation of the parental relationship in an age when divorce and child abuse are at least as commonplace as ever, and the Court does not say that we can.

In short, if "current conditions" compel today's decision, it is hard to see what they are. I agree that the Court is empowered

---

**13.** The Court may have in mind the following observations by Dean Pound:

> As against the world at large a child has an interest in the relation [with a parent] because of the support he may expect by virtue thereof while infancy or, after majority, circumstances precluding self-support render it improper or impossible for him to be left to himself. Also he has an interest in the society and affection of the parent, at least while he remains in the household. But the law has done little to secure these interests. At common law there are no legal rights which protect them.

Pound, *Individual Interests in the Domestic Relations,* 14 Mich.L.Rev. 177, 185 (1916). Dean Pound did not conclude from these observations, however, that loss of consortium should be awarded when a family member was injured by a third party. Rather, he stated:

> The reason for not securing the interest of wife or child in these cases seems to be that our modes of trial are such and our mode of assessment of damages by the verdict of a jury is necessarily so crude that if husband and wife were each allowed to sue, instead of each recovering an exact reparation, each would be pretty sure to recover what would repair the injury to both. Moreover the injury to wife or child is very hard to measure in money....
> ... Perhaps a no less cogent reason may be found in consciousness on the part of the courts that very little is actually achieved by the husband's actions, already in the law, which should be applied by analogy to make the law logically complete.

*Id.* at 194–95.

to reexamine common law rules. But to make a legitimate change in common law rules the Court needs more than power; it needs a sound basis for doing so. I am not sure the Court recognizes this distinction.

2

According to the Court, the inquiry in this case should be "whether the parent-child relationship in our modern society is 'as worthy of protection from negligent invasion as are other legally protected interests.'" *Supra* at 466. The Court purports to derive this "worthy of protection" test from *Whittlesey*. The test is not supported by *Whittlesey*, nor can it be determinative of whether to allow damages for loss of consortium.

The holding in *Whittlesey* was not based upon its conclusion that the marital relationship was worthy of protection. *Whittlesey* gave two principal reasons for its holding: that it was following a majority of jurisdictions, and that it was correcting a paradox in Texas law that allowed compensation for direct, intentional injury to the marital relationship but not indirect, negligent injury.[14] If the Court today followed *Whittlesey*, it would not reach the conclusion it does. If the Court followed the rule in a majority of jurisdictions, as *Whittlesey* did, it would deny recovery for loss of parental consortium in this case. And if the Court allowed the same recovery for indirect injury to the parental relationship as is allowed for direct injury, there would be none in these circumstances. Texas law, like the common law generally, has never allowed recovery for direct injury to the parental relationship. In fact, as noted above, Texas has, like most other American jurisdictions, abolished the right to recover for direct injury to the marital relationship on which *Whittlesey* relied. TEX.FAM.CODE §§ 4.05–4.06.

The Court derives its "worthy of protection" test from the following sentence in *Whittlesey:*

Providing either spouse with a cause of action for loss of consortium would allow us to keep pace with modern society by recognizing that the emotional interests of the marriage relationship are as worthy of protection from negligent invasion as are other legally protected interests.

572 S.W.2d at 668. The emphasis in this sentence seems to be more on keeping pace with *modern society* than on whether an interest is worthy of protection. To find in the phrase, "worthy of protection", the test which determined, albeit implicitly, the result in *Whittlesey* and which must therefore be the basis of analysis in this case requires a very expansive reading of this one sentence. More plausibly, the observation is merely another recognition of the majority rule that allowed recovery in that case.

The right to recover damages for loss of consortium resulting from injury to a personal relationship cannot depend upon whether the relationship is "worthy of protection". The test proves everything and nothing. The marital relationship found to be worthy of protection in *Whittlesey* is no longer protected from direct injury, yet the statutory abolition of actions for criminal conversation and alienation of affections has not prompted reconsideration of the holding in *Whittlesey*. The marital relationship has not become less worthy of protection in the past fifteen years, simply because it is entitled to less protection. The relationships between siblings, grandparents and grandchildren, other family members, and even friends are surely close, important relationships, sometimes as meaningful as those between spouses and between parents and children, and equally worthy of protection. The Court does not hold that these other relationships

**14.** Specifically, the Court stated:

Therefore, we hold that either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence. This holding not only aligns Texas with the majority of jurisdictions recogniz-

ing the action for either spouse, but it also corrects a paradox in the law of this state in that heretofore the marital relationship has been protected from only intentional invasions.

572 S.W.2d at 668 (footnote omitted).

are not worthy of protection but nevertheless states that it has "little difficulty" denying recovery for injuries involving them. *Supra* at 466. It is quite obvious that the Court has "little difficulty" with this and the other conclusions it reaches, but it is not so obvious why.

The Court also says that it would be "hard pressed" to conclude that injury to a parent did not result in "an equally serious deprivation" as the death of that parent, or the death of a child, or the death or injury of a spouse. *Supra* at 466. Again, the argument proves too much or nothing at all. Almost any loss of a close friend or family member is a "serious deprivation".[15] If every such serious deprivation should be recompensed with money damages, then a person should be entitled to damages for loss of consortium whenever someone close is injured. The Court, however, would not allow recovery for every "serious deprivation", only for some.

To characterize certain close, personal relationships as "worthy of protection" and the loss of such relationships a "serious deprivation" is unavoidably demeaning to others. The very idea contemplates that some personal losses are not "serious", and that some relationships are unworthy of protection, or in the Court's ill-chosen words, have "second class status". *Supra* at 466. If it is reassuring to parents and children to know that this Court considers their relationships to be first class, it must be equally insulting to other family members to have their relationships judicially relegated to lesser status. To decide what relationships are "first" and "second class", and "worthy of protection" or "unworthy", and what personal losses are "serious" and "not serious", is grossly presumptuous. The Court ought not to place itself in the position of making such determinations, and it certainly should not generalize and divide relationships by category without considering their particular aspects in specific circumstances. If recovery for loss of consortium really depended upon whether the injured relationship was "worthy of protection"—and it certainly should not—that determination ought to be left to the finder of fact to be made from the evidence adduced in each case. Not even the Court is willing to go so far, preferring categorization over individual determination.

Whether to allow recovery for loss of consortium must not depend upon the worth of the relationship injured or the seriousness of the loss. The emotional, spiritual attributes of all kinds of personal relationships are immeasurable. The Court's "worthy of protection" standard is alluring rhetoric but very flawed and unfortunately offensive reasoning. Allowing damages for loss of consortium must instead depend on the ability of our legal system to determine appropriate monetary compensation for such intangible, emotional injuries, an ability Dean Pound characterized as "necessarily ... crude". Pound, *supra*, at 194.

3

As the Court notes, the law does allow recovery of damages for loss of consortium when a spouse is injured, and in wrongful death cases. From this the Court concludes that damages should likewise be awarded for loss of consortium when a parent is injured. Besides the obvious logical deficit in this reasoning, there are other reasons not to reach the conclusion the Court does.

In the first place, the Court's argument for extending recovery based upon its own precedent rings of rationalization. It was, after all, the Court which allowed recovery for loss of spousal consortium in *Whittlesey*, and consortium damages in wrongful death cases in *Sanchez* and *Cavnar*. In effect, the Court reasons that because it has allowed consortium damages before it should do so again—indeed, it must do so

---

15. "No man is an island, entire of itself; every man is a piece of the continent, a part of the main; if a clod be washed away by the sea, Europe is the less, as well as if a promontory were, as well as if a manor of thy friends or of thine own were; any man's death diminishes me, because I am involved in mankind; and therefore never send to know for whom the bell tolls; it tolls for thee." J. DONNE, DEVOTIONS UPON ENERGENT OCCASIONS, NO. 17.

to be consistent. There is no end to the attainments possible with this bootstrap logic.

Furthermore, if the Court truly felt bound by *Whittlesey, Sanchez* and *Cavnar,* then it would acknowledge that those cases do not support its decision today. *Whittlesey* recognized a right to recover for loss of spousal consortium that the common law had extended to husbands for centuries and wives for decades. The common law never allowed an action for loss of parental consortium. Following a rule long established under the common law simply does not justify adopting a rule unknown to the common law. *Sanchez* and *Cavnar* followed a majority of states in allowing consortium damages in wrongful death actions. Those cases recognize that the economic loss from the death of a family member, while sometimes substantial, is often nonexistent, and if any recovery is to be had at all as a result of death as distinct from injury, it frequently must be for non-economic damages. The Legislature created wrongful death actions, but it has never created an action for injury to a relative. Extending the damages recoverable in established actions does not justify creating new causes of action to recover similar damages for other injuries.

Wrongful death and spousal injury actions are exceptions to the general proposition that loss of consortium is not a compensable injury. These rather narrow exceptions have not proved to be unmanageable, although they are not without difficulties, practical and logical. Awarding damages for loss of parental consortium is greatly more difficult, as I shall show below.

4

The Court's recourse to *Whittlesey, Sanchez* and *Cavnar* suggests that in the context of these cases the denial of recovery for loss of parental consortium would be anomalous. Actually, permitting such recovery is the anomaly.

If David Reagan had simply decided to abandon Julia, she would have suffered as serious a deprivation of his care and affection as she has in this case, but she would not have a cause of action against him, no matter how reprehensible his actions. Although parents in this state are obliged to support their children financially, *see* TEX. FAM.CODE §§ 4.02, 12.04, they have no legal duty to provide them affection. A daughter cannot sue her father for failing to love her.

If Julia had lost the care and love of her father not because he was negligently hit in the head in a fight at a beer joint but because one of the barmaids at the beer joint intentionally enticed him to abandon his family for her, Julia would have suffered the same loss of her father's consortium that she has suffered in this case, but she would not be entitled to recover damages either from her father or his Lorelei. The law has never afforded a child recovery for direct, intentional injury to the parental relationship. "If a claim is not allowed for an intentional tort, it would be strange indeed that it should be allowed for a negligent tort." *Pleasant v. Washington Sand & Gravel Co.,* 262 F.2d 471, 473 (D.C.Cir.1958). Yet that is the result of the Court's decision.

Julia cannot recover for the loss of her father's consortium caused by her parents' decision to divorce and her mother's decision to remarry. She cannot sue her stepfather for damages for ordering Reagan not to telephone Julia. The injury to Julia's relationship with her father caused by her parents' divorce, her father's move to Texas, and her mother's remarriage is no less real than the injury caused by Lucky Vaughn; only the latter, however, is compensable under the Court's rule.

If the Court's purpose is to protect children from the wrongful deprivation of their parents' affection, then it has not accomplished much by today's ruling. If only it would extend its rule to cover other injuries to the parent-child relationship which are equally as serious as those it would recompense and very much more frequent, it might achieve real protection of children. As it is, the Court's ruling helps very few children. It surely goes without saying that awarding money to a child who cannot

spend it until majority does nothing to help relieve the loss of relationship with the parent at all; rather, as one court has observed, it simply assures "that upon reaching adulthood, when plaintiffs will be in less need of [parental] guidance, they will be unusually wealthy men and women." *Borer v. American Airlines,* 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 862 (1977). On the whole, the Court's ruling does little more than increase the stakes in high-dollar personal injury litigation.

## B

The rule the Court adopts is unmanageable. It extends the right to recover monetary damages for an intangible loss which cannot be measured. It does nothing to prevent overlapping recovery when there are multiple claimants as a result of a single occurrence. It is not limited to claims by minor children, and is not clearly limited to instances involving serious injury to the parent. And it is likely that the recovery the Court allows will result in additional friction in relationships already marred by physical injury. The Court appears to be oblivious to these problems, for it chooses not to mention them or to refute this dissent.

### 1

The law recognizes that some intangible, non-economic injuries may be compensated with an award of money damages. Such injuries include physical pain, mental anguish, impairment and disfigurement resulting from personal injuries. No appraiser can testify to the value of such losses. Yet juries must do what no one else can: they must set a specific dollar figure on these intangible injuries.

Like other intangible injuries, the loss of a family member's "love, affection, protection, emotional support, services, companionship, care, and society", *supra* at 467, cannot be measured in dollars and cents. Assessing damages for loss of consortium, however, is even harder than for other intangible losses. As Dean Pound observed, "in so far as these interests are in

effect interests of personality, they are so peculiarly related to the mental and spiritual life of the individual as to involve in the highest degree the difficulties incident to all legal reparation of injuries to the person." Pound, *supra,* at 196.

The Court takes no notice of the immense difficulties inherent in the task. The Court holds that jurors awarding damages for loss of parental consortium may take into account "the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium giving relationships are available to the child." *Supra* at 467. I doubt whether jurors will find these factors to be of much help. Regarding the child's age, for example, I cannot tell whether the Court thinks injury is greater when the child has become close to the parent but is less in need of parental guidance, or when the child is an infant and does not know the parent but is very much in need of some parental care. Considering the child's personality, I do not know if the Court thinks that injury involving a well-adjusted, stable child is worth more or less than injury involving an emotionally insecure child. Regarding the availability of "other consortium giving relationships", I cannot tell whether the Court actually thinks that a child in a larger family suffers less from parental injury than an only child. I simply do not see how the Court can imagine that anyone, even a juror, can use these factors to arrive at a monetary value for loss of parental consortium. The factors are as imponderable as the loss itself, and applying them is mostly guesswork.

Consigning to a jury the task of assessing damages for loss of parental consortium does not make it any less difficult, or the result any more defensible. Consider the present case. No direct evidence of the dollar amount of Julia's damages was introduced in this case, no doubt because such evidence is not available and because, as any experienced litigator will appreciate, it is virtually impossible to speak of a loss

like Julia's delicately and respectfully in terms of money. The bare mention of the relative value of a personal, intangible loss risks offending jurors. The only suggestion to the jury about what they should find from the facts before them came from counsel in closing arguments. Reagan's counsel's entire argument on the subject was the following:

> For Julie Reagan I think you ought to be $2,500 a year. You're talking about support in the past, support in the future. That's what I would do a year and just multiply it.
>
> Loss of parental care. What is that worth? I suggest $250,000.
>
> I suggest $250,000 on mental anguish in the past and mental anguish in the future. A lot of money? But I think she has suffered. This is in my career, without a doubt, one of the worst injuries I have ever seen, both as to consequences and injuries it caused.

The guardian ad litem appointed for Julia never mentioned a dollar amount to the jury but argued briefly that Reagan would not be able to do the kinds of things for Julia that another father might do for his daughter. Defendants' counsel argued only:

> Now there's a little girl I know who will suffer more than anybody, but that's unfortunate. As you've heard, and I can't answer questions of these folks on the stand, the mother remarried and I know she's got a stepfather and I understand a stepfather is not the same as a father. She's the person that will suffer but, unfortunately, it's not because of anything that Lester Vaughn, Ernest Rosenovac or Keith Nichols did. It was because of what David Reagan did.

Based upon this argument and the evidence summarized above, the jury awarded Julia $405,000 for lost parental care and past and future mental anguish.

There is nothing in the evidence in this case to indicate that Julia should get $405,000 for her loss. The jury appears simply to have accepted some of the figures suggested by Reagan's counsel in argument. The jury might just as well have assessed damages at $1,000 or $1,000,000; I doubt seriously whether either award would have been set aside as either inadequate or excessive. In future cases, some children will "hit the jackpot" while others will be awarded little or nothing, depending mostly on factors like which attorney is more persuasive, which party is more sympathetic, and the geographical location of the trial—none of which have anything whatever to do with any loss that may have been suffered. In no case will any real loss be restored. I can see very little justification for a rule which allows such lottery-like awards and serves as much or more to benefit lawyers than the children the rule professes to protect.

The difficulty in assessing compensation for intangible injuries is unavoidably present in most personal injury actions. Now, if the injured person is a parent, that difficulty is multiplied by the necessity of considering the more remote injuries to the children's relationships with the injured parent. The Court offers no justification for this result.

### 2

Further complicating assessment of damages for a child's loss of parental consortium is the difficulty in preventing such recovery from overlapping or conflicting with damages awarded to the injured parent or to any sibling. Apart from any claim by the child, the injured parent may ask the fact finder to consider as an element of any damages assessed the impairment in performing parental responsibilities that the parent claims to have suffered. If damages are assessed for this element of recovery, the injury to the parent-child relationship has been compensated at least in part. Under the rule the Court adopts today, each of the injured parent's children may also sue for damages to the parent-child relationship. To prevent multiple recovery for the same injury, the damages awarded the parent and each child should not overlap each other. Also, the damage awards should not be conflicting: that is, a child should not be awarded damages for loss of consortium when the in-

jured parent has not recovered damages for any loss of ability to love and care for the child; and recovery by similarly situated children should not be greatly disparate.

Overlapping and inconsistent awards to family members can be prevented, if at all, only if all parties are joined in the same action and the jury is carefully instructed regarding its findings. Even then, jury instructions may be an ineffective prophylactic against multiple recovery. As the California Supreme Court has observed, "to ask the jury, even under carefully drafted instructions, to distinguish the loss to the mother from her inability to care for her children from the loss to the children from the mother's inability to care for them may be asking too much." *Borer v. American Airlines*, 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 863 (1977). If the children do not join in the action by their injured parent, the risk of double recovery and conflicting verdicts is greatly exacerbated. Consequently, of the nine jurisdictions that have recognized a child's cause of action for loss of parental consortium, seven have expressly required or strongly encouraged joinder of the children's claims with the parent's. *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 997 (Alaska 1987); *Villareal v. State Dep't of Transp.*, 160 Ariz. 474, 481, 774 P.2d 213, 220 (1989); *Weitl v. Moes*, 311 N.W.2d 259, 270 (Iowa 1981), *overruled in part and modified, Audubon–Exira Readymix, Inc. v. Illinois Cent. Gulf R.R.*, 335 N.W.2d 148 (Iowa 1983); *Hay v. Medical Center Hosp. of Vt.*, 145 Vt. 533, 496 A.2d 939, 943 (1985); *Ueland v. Reynolds Metals Co.*, 103 Wash.2d 131, 691 P.2d 190, 194 (1984); *Rineck v. Johnson*, 155 Wis.2d 659, 456 N.W.2d 336, 342 n. 1 (1990); *Nulle v. Gillette–Campbell County Joint Powers Fire Bd.*, 797 P.2d 1171, 1176 (Wyo.1990).

In Texas wrongful death actions, overlapping or conflicting recovery by the statutory beneficiaries—"the surviving spouse, children, and parents of the deceased", TEX. CIV.PRAC. & REM.CODE § 71.004(a)—is precluded by the requirement that all beneficiaries join in the same action. *See* TEX. CIV.PRAC. & REM.CODE §§ 71.002(a), 71.-004(b), 71.010; *Dennis v. Gulf, C. & S.F. Ry.*, 148 Tex. 387, 224 S.W.2d 704, 705 (1949); *San Antonio & A.P.R. Co. v. Mertink*, 101 Tex. 165, 105 S.W. 485 (1907); *East Line & Red River Ry. v. Culberson*, 68 Tex. 664, 5 S.W. 820, 821 (1887). This requirement that children join in the action for the death of their parent should likewise apply to actions to recover for nonfatal injury to the parent.

Rule 39 of the Texas Rules of Civil Procedure generally requires joinder of interested parties subject to service of process when their absence raises "a substantial risk of ... double, multiple, or otherwise inconsistent obligations".[16] This rule

16. Rule 39 states in pertinent part:

**Rule 39. Joinder of Persons Needed for Just Adjudication**

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

**(b) Determination by Court Whenever Joinder Not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

**(c) Pleading Reasons for Nonjoinder.** A pleading asserting a claim for relief shall state

would seem to require joinder of children with claims for loss of parental consortium in the parent's cause of action.

The threat of double recovery is sufficiently real that awards of damages for loss of consortium caused by injury to another should not be expanded beyond actions involving spouses and wrongful death actions. Even if recovery is to be allowed for loss of parental consortium, the Court should attempt to reduce this threat. Despite Rule 39, the requirement in wrongful death actions, and the practice of seven of the nine states the Court purports to follow, the Court inexplicably refuses to direct that children's claims for loss of parental consortium be joined with the parent's claim.

### 3

As noted above, of the nine states which have allowed recovery for loss of consortium due to injury to a parent, all but three—Michigan, Iowa and Washington—have restricted recovery to minor or dependent children. The child in this case was four years old at the time her father was injured, and eleven years old at the time of trial. Ordinarily, the Court should limit its ruling to the facts before it. In this case, the Court chooses not only to create a new cause of action but to extend it to a class of claimants who are not before the Court. Adult children are usually no longer dependent on their parents and have no legal right to parental support. Absent this element of dependence, it would seem to be much more difficult to distinguish between the parent-child relationship and other close family relationships, such as between siblings. Since the Court has "little difficulty" excluding siblings from the class of beneficiaries of its new rule, I would have thought the Court might have at least some difficulty in not excluding non-dependent children. But it apparently does not.

It is also difficult to foresee, I think, what additional practical problems attend to extending this new cause of action to adult children. Inasmuch as adult children are not as likely as minor children to live near their parents, the problems of locating adult children and joining them in litigation will surely be greater. And the difficulties in assessing damages for loss of parental consortium may be even greater when the loss of parental support is not a factor. It would be prudent to await cases involving adult children before deciding them.

Although the Court's opinion is not entirely clear, it does suggest that damages for loss of parental consortium cannot be recovered unless the parent's injury is "serious, permanent, and disabling". As noted above, three states have expressly limited recovery to cases involving such injuries. In Arizona, the injury must be so severe "that the parent-child relationship is destroyed or nearly destroyed." *Villareal v. State Dep't of Transp.*, 160 Ariz. 474, 480, 774 P.2d 213, 219 (1989). I do not know whether the Court has this strict a limitation in mind or some other.[17] And it chooses not to elucidate.

### 4

As the Court recognizes, a child's right to recover for negligent injury to a parent must be derivative of the parent's action and thus subject to any defenses which the defendant may have. *See Reed Tool Co. v. Copelin*, 610 S.W.2d 736, 738–39 (Tex. 1980). Those defenses include the extent to which the parent's own negligence contributed to the injury. *See National County Mut. Fire Ins. Co. v. Howard*, 749 S.W.2d 618, 622 (Tex.App.—Fort Worth 1988, writ denied). Thus, the Court concedes, albeit only in its opinion on rehearing, that defendants in this case should have been entitled to a reduction in the

the names, if known to the pleader, of any persons as described in subdivision (a)(1)–(2) hereof who are not joined, and the reasons why they are not joined.

**17.** For example, a Massachusetts appeals court has upheld a judgment awarding two daughters

$12,500.00 each for loss of consortium resulting from an injury to their father in which he lost parts of four fingers of his right hand. *Marques v. Bellofram Corp.*, 28 Mass.App. 277, 550 N.E.2d 145 (1990).

damages awarded Julia based upon the percentage of negligence which the jury attributed to Reagan. *Supra* at 468.[18]

Of course, controversy about the extent to which a parent has been the cause of injury to a child cannot help but cause additional stress and friction to family relationships. If Julia Reagan is ever told that her father was determined to have been 40% responsible for destroying their relationship, I doubt whether that knowledge will endear him to her. The Court professes to protect family relationships, but the consequences of its rule may not be so noble.

## IV

### A

The far-reaching effects of the Court's legislation today seem to have escaped its notice. Before today, the only persons who could claim damages resulting from the tortious infliction of nonfatal bodily injury were the injured person and his or her spouse. Now the children of the injured person may assert their own claims. The potential liability for a single incident of bodily injury has thus been multiplied. The liability for injury to a person with children may be greater than for a person who is childless, resulting in an unpredictable range of exposure. Someone who injures a single person may get off relatively lightly compared with someone else who inflicts no greater injury on a married person with children. *See Borer v. American Airlines*, 138 Cal.Rptr. at 307–08, 563 P.2d at 863–64.

To assure that all claims arising from a single incident have been resolved, a settlement must include the injured person's spouse and children. A party who may be liable for bodily injury to a person may understandably be reluctant to settle with the injured person without also securing the release or agreement of the person's spouse or children. Because the children need not be minors, there may be difficulty in locating them, which will contribute either to the delay in resolving the matter, if they are finally found, or the uncertainty that any agreement without them is a final resolution. Any settlement with minor children must be judicially approved, necessitating the filing of a lawsuit and appointment of a guardian ad litem. Tex.R.Civ.P. 44, 173. *See Urbish v. 127th Judicial District Court*, 708 S.W.2d 429, 431 (Tex. 1986); *Lowery v. Berry*, 153 Tex. 411, 269 S.W.2d 795 (1954); *Missouri–Kansas–Texas R.R. v. Pluto*, 138 Tex. 1, 156 S.W.2d 265 (1941) (bill of review action by minor); *see also Newman v. King*, 433 S.W.2d 420, 421 (Tex.1968). The result is an increase in the legal fees involved in settling a simple personal injury claim if the injured person is a parent.[19]

If a settlement cannot be reached, litigation will be necessary. There can be no question that the Court's ruling today will increase the amount of litigation in this state. *See Truesdell v. Halliburton Co.*, 754 P.2d 236, 241 (Alaska 1988) ("Our decision in *Hibpshman* will almost certainly increase litigation."). The Court ignores the potential impact of these new claims on our already overburdened legal system.

### B

The Court insists that it is only reexamining common law rules in light of current

---

**18.** The Court holds that defendants have waived the reduction in damages to which they would be entitled because they did not request it in their motion for rehearing. If the Court refers to defendants' motion for rehearing in the court of appeals, defendants were not required to raise a right to reduction in damages because the appeals court's judgment denied any recovery to Julia. Defendants have not complained of this aspect of the appeals court's judgment in their favor. If the Court refers to the motion for rehearing in this Court, defendants might have raised the issue, but I know of no rule requiring them to do so. In reversing the judgment of the court of appeals and rendering judgment in Julia's favor, the Court was obliged "to render such judgment ... as should have been rendered by the ... court of appeals". Tex.R.App.P. 182(a). Defendants are not required to prompt the Court to discharge this duty.

**19.** Fees for guardians ad litem can be very substantial and have been the subject of criticism. *See, e.g.,* Elder and Ballard, *Making $93,650 the Easy Way*, Texas Lawyer, March 4, 1991, p. 1, col. 1.

conditions. I was not aware that there was a public clamor for more personal injury lawsuits. Many of the damage claims allowed by the Court in today's decision will be paid ultimately by the public in the form of increased costs of goods and services, and increased insurance premiums. The continued viability of this wealth redistribution system is everyday more in doubt.[20] The personal injury compensation business employs thousands, many of whom are attorneys who are rewarded quite handsomely, partially at the expense of its customers who must bear the terrible overhead of expenses, fees and costs, and partially at the expense of the public. The extent to which the unlimited growth of this business benefits society remains to be measured.

The Court does not even pause to acknowledge these current conditions in light of which it is to reexamine the established common law rule. It does not take evidence on the benefits and costs of the rule it adopts, as it might if it were a legislature. It does not seek expert prognosis on the probable effects of the rule. The Court does not need this kind of information regarding the effect of changes in the law to inform its decisions. The Court knows best. It simply announces that it is time to change the rule.

The Court's decision reflects an ever-expanding universe of tort liability. It is difficult to find in its opinion any principled parameters on the kinds of relational injuries or claimants which might be held to be compensable. For example, I suspect that the Court's opinion will soon be used to argue that having allowed recovery for loss of spousal and parental consortium, we should also allow recovery for loss of filial consortium. Two of the states which have recognized recovery of parental consortium have refused to extend recovery to filial consortium. *Norman v. Massachusetts Bay Transp. Auth.*, 403 Mass. 303, 529

N.E.2d 139 (1988); *Sizemore v. Smock*, 430 Mich. 283, 422 N.W.2d 666 (1988). As the Massachusetts highest court recognized, courts should proceed with an awareness that "as a matter of sound public policy, the law cannot and should not attempt to right all wrongs.... '[T]ort liability cannot be extended without limit.'" *Norman*, 529 N.E.2d at 140.

\* \* \* \* \* \*

The decision in this case is founded almost entirely on nothing sturdier than the personal preferences of a majority of the members of the Court as to what the law should be. It is this Court's prerogative to develop the common law, but its stewardship of that jurisprudence does not authorize it to act as a judicial oligarchy imposing its individual whims of what is fair on the public. The rule the Court adopts is unwise; but the manner in which the Court adopts that rule is imperious.

Accordingly, I dissent.

PHILLIPS, C.J., joins in all but part IV B of this concurring and dissenting opinion.

CORNYN, J., joins in this concurring and dissenting opinion.

DOGGETT, Justice, concurring and dissenting.

The concurring and dissenting opinion of December 19, 1990 is withdrawn and the following is substituted.

The court creates an arbitrary restraint barring Julia Reagan from recovering damages the jury found to represent the mental anguish she suffered as a result of a disabling injury to her father. When a parent is rendered child-like as a result of a tragic incident, the child suffers myriad injuries. In this family relationship turned upside-down, the child is burdened prematurely and unexpectedly with the obligation to care for the parent and is deprived of

---

**20.** *See, e.g.,* The Brookings Institution, Liability (R. Litan & C. Winston ed. 1988); Committee for Economic Development, Who Should Be Liable? (1989); A. Ferguson, The Liability Crisis and How to Solve It (1987); J. Fleming, The American Tort Process (1988); P. Huber, Liability (1988); J.

O'Connell, The Lawsuit Lottery (1979); J. O'Connell & C. Kelly, The Blame Game (1987). I do not espouse all the views of these authors but cite their works merely as examples of mounting criticism of the American tort system.

the important emotional and financial support of life's earliest role model. The child takes on this responsibility concomitantly with the sorrow and grief that must be faced on a daily basis in seeing the parent's greatly diminished mental and physical capacities.

By failing to recognize the full nature of this injury to the family unit, the court draws an arbitrary line advocated by none of the parties to this litigation. While I concur in that portion of the court's opinion expressly recognizing a cause of action for loss of parental consortium, and implicitly a consortium action by a parent upon injury of a child, I dissent from the denial of recovery for mental anguish damages.

Refusal to recognize mental anguish damages runs counter to decisions of this court in recent years that have sought to create a comprehensive and consistent system of damages for torts resulting in personal injury or death and to dismantle artificial barriers to the recovery of damages for mental anguish. In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), this court considered whether parents' damages arising from the death of a child should continue to be limited to the amount of financial support the child, if living, would have provided to the parent less the cost of the child's care, support and education. The court rejected this "antiquated" pecuniary loss standard that excluded consideration of the "real loss" sustained by the parent— the injury to the familial relationship:

> This court has recognized previously that injuries to the familial relationship are *significant injuries* and are *worthy of compensation.*

*Id.* at 251, 252 (emphasis supplied).

This court in *Sanchez* did not limit recovery to loss of consortium damages. Conscious of the realities of the nature of the injuries suffered when the family is shat-

tered by a tragic incident, we recognized that:

> The destruction of the parent-child relationship results in mental anguish, and *it would be unrealistic to separate injury to the familial relationship from emotional injury.*

*Id.* at 253 (emphasis supplied).[1] Based on these accurate and poignant observations, the court permitted recovery of damages for mental anguish when the familial relationship has been destroyed.

It is no less unrealistic to separate injury to the familial relationship from emotional injury when the destruction of the relationship is substantial but less than complete. The logic of *Sanchez* is not diminished when death is replaced with disabling injury. Our discussion of mental anguish in *Moore v. Lillebo*, 722 S.W.2d 683 (Tex. 1986), failed to draw such an insupportable distinction. Stating that "mental anguish inheres in the nature of certain torts," we recognized that "an emotional reaction ... is a natural by-product of *injury* to the familial relationship." 722 S.W.2d at 685 (emphasis supplied). *See also id.* at 686 ("the substance of the recovery is for emotional damage to the family unit").

The court turns to semantics to justify the result, reciting that previously approved actions for loss of consortium do not encompass recovery for mental anguish. A definition of loss of consortium that excludes damages for mental anguish, *see, e.g. id.* at 687–88, in no way precludes recovery for loss of consortium and mental anguish damages in the same lawsuit. We allow recovery for both in actions for wrongful death. *See, e.g., id.; Sanchez*, 651 S.W.2d at 251.

The second excuse offered for today's misguided result is that recovery of mental anguish damages would conflict with the "bystander recovery rule."[2] *Sanchez* ex-

---

1. We further rejected arguments that the damage to the relationship is too difficult to assess: "Injuries resulting from mental anguish may actually be less nebulous than pain and suffering, or injuries resulting from loss of companionship and consortium." *Sanchez v. Schindler,* 651 S.W.2d 249, 253 (Tex.1983).

2. Under that rule, a bystander may recover damages for mental anguish if (i) the plaintiff was located near the scene of an accident and not some distance from it, (ii) the shock resulted from a direct emotional impact from the plaintiff's sensory and contemporaneous observance of the accident and not from learning of it from others later, and (iii) the plaintiff and

plicitly rejected a similar argument, concluding that "there is no requirement that the plaintiff be within the zone of danger or have witnessed the accident in order to recover for mental anguish." 651 S.W.2d at 254 n. 6. Whether the rationale of *Sanchez* should apply to injury actions was not presented in *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex.1988). There recovery was denied for mental anguish to a stepfather who was not at or near the scene of the accident at the time it occurred but arrived later to witness his stepson in a severely injured condition. Our decision was limited solely to the claim for emotional distress induced by the apprehension of negligently caused injury to another. *Freeman* did not, however, address a claim for damages arising from the separate and distinct tort of injury to the familial relationship, nor did it cite or consider *Sanchez*, and it is therefore distinguishable.

A more considered approach, which would take into account *Sanchez* as well as the efforts of this court to remove arbitrary barriers to compensation for all of the actual elements of damage suffered, would allow recovery for mental anguish. Apparently the only court to have previously considered this precise question has determined that permitting such damages for injury to the familial relationship is not inconsistent with the rules governing bystander recovery. *Jacobs v. Anderson Bldg. Co.*, 430 N.W.2d 558, 560 (N.D.1988).

This court has, in fact, affirmed an award of mental anguish damages suffered by parents as a result of an injury to their child in a situation in which the requirements of the bystander recovery rule were clearly not met. In *Hall v. Birchfield*, 718 S.W.2d 313, 337 (Tex.App.—Texarkana 1986), *rev'd sub nom. Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361 (Tex.1987), the parents of a premature baby were led to believe they were taking a well baby home from the hospital. Three weeks later they learned that the child was blind. 718 S.W.2d at 337. In the trial court, the parents were awarded damages for past and future mental anguish suf-

fered by them "resulting from the blindness" of the child, as well as damages for "shock and emotional trauma" sustained by them upon learning of the child's blindness. *Id.* This court, relying on *Moore v. Lillebo*, affirmed the court of appeals' denial of recovery for shock and emotional trauma, as being duplicative of the mental anguish award. *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361, 368–69 (Tex.1987). While there is nothing in our opinion, or in that of the court of appeals, to suggest that the parents had observed the child being injured, the mental anguish award was affirmed.

The court's artificial separation of injury to the familial relationship from emotional injury contradicts our decision in *Sanchez* and defies the realities of the loss suffered by Julia Reagan, who must witness her father in a reduced mental state. Her emotional injuries should be compensated as well by permitting a recovery of mental anguish damages. I believe Texas law demands a more pro-family position than that which the court has adopted.

Justice Hecht's lengthy concurrence and dissent should be viewed by all those concerned with the development of our common law and the preservation of our jury system as a warning shot across their bow. Raising concerns about "our already overburdened legal system," supra at 487 (Hecht, J., concurring and dissenting), the dissenters have a swift solution: jurors stay home, victims seek solace elsewhere. Courts are too busy to dispense justice evenly.

Heavily masking its aspirations with a detailed description of the facts in this case, the opinion actually prefers to bar recovery to all—both the child of the town's cherished minister and the child of a less well regarded citizen. The contorted logic that destroys the rights of these children also bars an individual's recovery for the trauma naturally accompanying the wrongful death of a child or serious harm to a spouse that we previously approved in *Sanchez*, 651 S.W.2d 249, and *Whittlesey v. Miller*, 572 S.W.2d 665 (Tex.1978), as well

victim were closely related. *Freeman v. City of* *Pasadena*, 744 S.W.2d 923, 923–24 (Tex.1988).

as in any other action for noneconomic, human loss. The dissent's real quarrel is not with this single case or this particular cause of action; it is with the substantial body of common law governing the tort system that has developed over the past one-hundred years, not just the last twenty as suggested by Justice Hecht.

The dissenters' view stems from their suspicion and distrust of the concept of ordinary Texans, constituting a cross-section of their individual communities, assembling as a jury to make difficult determinations concerning the measure of noneconomic loss that sometimes tragically befalls a family. Their professed empathy is belied by epithets like "jackpot" and "lottery-like" that they apply to favorable jury findings for family members. Supra at 484.

The suggestion that one award returned by a Massachusetts jury, supra at 486 n. 17, demonstrates the weakness of the jury system is misleading. Juries may at times reach verdicts others term either outrageously excessive or paltry. Like any human endeavor, even authoring judicial opinions, errors are inevitable. But derogating the jury system does not solve the problem; it merely substitutes the judgment of legal experts regarding factual issues for that of a panel of citizens expert in the range of human experience. I prefer to respect jury decisions as the voice of the community and recognize that appellate courts exist to check egregious abuses.

That Justice Hecht is joined in full by one other justice, and in large part by another, bodes ill for Texas jurisprudence. Their real objective is steadily to erode the role of ordinary citizens as jurors in our system of justice and to deny Texans important rights.

MAUZY, J., joins this concurring and dissenting opinion.