**Karen ROBERTS, M.D., Appellant,**

v.

**Lainie WILLIAMSON and Casey Williamson, individually and as next friends of Courtnie Williamson, Appellees.**

No. 06–00–00070–CV.

Court of Appeals of Texas, Texarkana.

Submitted May 17, 2001.

Decided July 3, 2001.

See also, 52 S.W.3d 354.

Mary–Olga Ferguson, Robert L. Galloway, Thompson Knight Brown Parker & Leahy, LLP, Houston, for appellant.

Rex A. Nichols Jr., Rex A. Nichols Sr., Nichols & Nichols, PC, Longview, Karen Bishop, Bishop & Bishop, PC, Gilmer, for appellees.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Lainie and Casey Williamson sued Dr. Karen Roberts and Dr. Mark Miller for medical malpractice in treating their newborn daughter, Courtnie Williamson. The jury found no liability on the part of Dr. Miller, but found Dr. Roberts fifteen percent responsible for the injuries sustained by Courtnie. In four points of error, Dr. Roberts argues (1) that Dr. Frank McGehee was not qualified to offer expert testimony in the area of pediatric neurological injuries, (2) that there was no evidence of damages for Courtnie's medical expenses before and after age eighteen, her past and future physical impairment, disfigurement, loss of earning capacity, lost earnings, and past and future physical pain and mental anguish, (3) that Texas law does not recognize a parent's right to recover for loss of consortium with a nonfatally injured child, and (4) that the trial court erred in not applying a settlement credit to the Williamsons' recovery from Dr. Roberts.

The Williamsons filed a motion with this court for partial dismissal of the appeal. They contend that Dr. Roberts failed to preserve her no evidence, insufficient evidence, and excessiveness of damages issues because she filed her Motion for New Trial four days late. The Williamsons' contentions do not relate to our jurisdiction over the appeal. Thus, we overrule the motion, but consider the contentions regarding preservation of error in this opinion.

On September 15, 1996, Lainie gave birth to Courtnie at Laird Memorial Hospital in Kilgore, Texas. The following day, Courtnie began experiencing difficulty breathing. She was suffering from severe acidosis, a condition that could cause permanent harm in a matter of minutes. Dr. Roberts, a consulting physician with Laird Memorial Hospital, was called to the hospital from Longview to treat Courtnie. Dr. Roberts arrived but continually refused to treat Courtnie with sodium bicarbonate, despite the fact that several other physicians recommended this treatment. Additionally, Courtnie was "hooked up" to a nonfunctioning pediatric ventilator for nine minutes. After Courtnie spent hours at Laird Memorial Hospital in this condition, Dr. Roberts authorized her transfer to Shreveport Medical Center in Shreveport, Louisiana. As a result of the lengthy period that Courtnie was deprived of oxygen, she suffered multiple intercranial hemorrhages and sustained massive, permanent injury to the right side of her brain.

**Expert Testimony**

As her first point of error, Dr. Roberts contends that the Williamsons' medical malpractice expert, Dr. Frank McGehee, a board-certified pediatrician, was not qualified to testify regarding Courtnie's neurological injuries.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R.EVID. 702. The party offering the expert testimony must show that the witness is qualified under Rule 702. *Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996). The admission or exclusion of expert testimony lies in the sound discretion of the trial court. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995).

A medical doctor is not, by virtue of a medical degree, automatically qualified to testify on any specific medical subject. *Broders*, 924 S.W.2d at 153. The party offering the expert's testimony must show that the expert has expertise, training, education, or knowledge "regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153–54. In *Broders*, the Texas Supreme Court upheld a trial court's refusal to allow an emergency room doctor to testify regarding the causation of certain neurological injuries.

In the present case, the Williamsons established that Dr. McGehee was a board-certified pediatrician. As the basis for his testimony regarding the neurological damages suffered by Courtnie, Dr. McGehee relied on the testimony of a pediatric neurologist (Dr. Mark Laney), diagnostic test results, and peer-reviewed medical articles. Dr. McGehee's resume established that he was a board-certified pediatrician with neonatal training and many years of experience. His testimony revealed that he was experienced in treating and stabilizing ill newborns, was certified in pediatric advanced life support (PALS), was certified in advanced trauma life support

(ATLS), formerly served as the chief of medical staff at Denton Regional Medical Center, formerly served as the chief of pediatrics at Flow Memorial Hospital in Denton, and taught pediatrics to family practice residents.

■ To establish his expertise in the specific area of neurology, Dr. McGehee testified that in forming his opinion on Courtnie's neurological damage, he relied on his foundational medical training and enhanced that knowledge by reviewing Courtnie's diagnostic tests from the University of Arkansas at Little Rock, her diagnostic tests from Gregg County Early Childhood Development, several medical peer-review journal articles and textbooks on pediatric neurology, and, most importantly, the testimony of Dr. Mark Laney, a pediatric neurologist whose videotaped deposition testimony was presented to the jury without objection. Additionally, Dr. McGehee testified that he routinely advised parents on the effects of the type of injury Courtnie had sustained and on the types of problems the parents could expect to encounter in the future. Although Dr. McGehee was not a board-certified neurologist, his testimony established that his medical training, his in-depth study of Courtnie's condition, his extensive review of pediatric neurology articles, his reliance on Dr. Laney's testimony, and his experience in advising parents on the effects of injuries such as Courtnie's qualified him as both knowledgeable and educated regarding the specific issue on which he testified: the neurological damages, long-term prognosis, and future medical needs of an infant who sustained neurological damages due to oxygen deprivation. The trial court did not abuse its discretion by allowing Dr. McGehee's testimony.

■ Moreover, a showing of harm is required, and Dr. Roberts has failed to address harm in her appellate brief. *See*

*Spivey v. James*, 1 S.W.3d 380, 385 (Tex. App.—Texarkana 1999, pet. denied). No harm arose from Dr. McGehee's testimony because his testimony was cumulative of Dr. Laney's testimony. Dr. Laney's qualifications as a pediatric neurologist were not questioned by Dr. Roberts at trial or on appeal, and his testimony was presented to the jury without objection. He gave the same analyses as Dr. McGehee regarding the neurological damages sustained by Courtnie and also analyzed Courtnie's long-term prognosis. In fact, Dr. Laney's testimony was even more detailed and exhaustive than Dr. McGehee's.

The first point is overruled.

**Legal Sufficiency**

In her second point, Dr. Roberts contends that there was no evidence to support the award of damages for past and future medical expenses, past and future physical impairment, disfigurement, loss of earning capacity, future lost earnings, past and future physical pain and mental anguish, and loss of consortium.

■ The Williamsons contend that Dr. Roberts failed to preserve these issues for appeal by failing to include them in her Motion for New Trial. However, she was not required to include her no evidence issues in a motion for new trial. No evidence issues may be raised by either (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, *or* (5) a motion for new trial. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex.1992). The record shows that Dr. Roberts either moved for a directed verdict or objected to the jury charge on all the issues about which she now raises no evidence contentions.

Additionally, the Williamsons contend that Dr. Roberts challenges the factual sufficiency of the evidence supporting the jury's damage award for Courtnie's reasonable and necessary medical expenses and that Dr. Roberts failed to preserve error for appeal. However, in her brief, Dr. Roberts contends, "There was no evidence of the amount of medical expenses to be expected from the date of trial up to Courtnie's 18th birthday." We conclude this is a no evidence point and, as stated above, was properly preserved for appeal.

 When reviewing legal sufficiency, we must determine if there is evidence of probative force to support the jury's finding and must consider all the evidence in the record in the light most favorable to the party in whose favor the jury found. We must apply every reasonable inference from the evidence in that party's favor. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). We disregard all evidence and inferences contrary to the jury's finding. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711; *Burroughs Wellcome Co.*, 907 S.W.2d at 499.

The jury awarded Courtnie's parents a total of $600,000 for the medical expenses they had incurred up to the date of trial and those that they will incur until Courtnie reaches age eighteen. The jury awarded Courtnie $600,000 for the medical expenses she will incur after age eighteen. Dr. Roberts alleges that both these awards were based on no evidence.

 First, the $600,000 award to Courtnie's parents encompasses both the expenses they incurred before trial and those they will incur until Courtnie reaches age eighteen. At trial, the jury heard testimony that doctors had placed a shunt in Courtnie's brain. The shunt relieves fluid pressure on Courtnie's brain and drains that fluid into her abdomen. At the time of trial, Courtnie had undergone four different surgeries to replace infected shunts and shunts she had outgrown. To prove the cost of those surgeries and the other medical expenses the Williamsons had incurred up to the date of trial, they offered documentation establishing a total of approximately $350,000 in medical expenses. The medical bills were admitted into evidence without objection. That amount accounts for over half of the $600,000 awarded to Courtnie's parents, and at the time of trial, Courtnie was only three years old. The remainder of the award to Courtnie's parents and the $600,000 award to Courtnie were, in terms of the proof required at trial, future expenses, even though they were submitted to the jury in terms of Courtnie's age; therefore, when analyzing whether there was any evidence of those damages, we must follow the legal standard for future medical expenses.

"The award of future medical expenses is a matter primarily for the jury to determine. Precise evidence is not required." *Gladewater Mun. Hosp. v. Daniel*, 694 S.W.2d 619, 621 (Tex.App.—Texarkana 1985, no writ). In *Gladewater*, this court articulated four factors on which a jury

could base its award of future damages: (1) the nature and course of the injuries or disability, (2) the medical care rendered before trial, (3) past medical expenses, and (4) the condition of the injured party at the time of trial. *Id.*

■ In addition to the past medical care and past medical expenses discussed above, the jury heard testimony that Courtnie would be required to have a shunt in her brain for the rest of her life and that Courtnie, although brain damaged, had an average life expectancy. Lainie testified that she understood Courtnie might need additional surgeries in the future to replace or repair the shunt and there was no way to predict how many of those surgeries Courtnie will have to undergo. She also testified that she was informed the cost of caring for the shunt could exceed $1 million over the course of Courtnie's life. The Williamsons introduced documentation into evidence through Dr. McGehee establishing that the maintenance of Courtnie's shunt alone could reach approximately $1.2 million. Dr. Roberts takes issue with the fact that the documentation only addressed costs up to age eighteen, a fact that Dr. McGehee acknowledged at trial. However, as articulated in *Gladewater,* precise evidence of future expenses is not required. Just as the jury may rely on past medical expenses, the jury may also rely on an approximation of expenses that would occur before age eighteen to calculate expenses at age eighteen. All of those damages are future damages from the perspective of the juror.

■ The trial testimony and the medical bills offered by the Williamsons established more than a scintilla of evidence to justify the jury's award of $600,000 in medical expenses that Courtnie's parents will incur before age eighteen. Moreover, under our holding in *Gladewater,* the jury

is allowed to consider pre-age-eighteen costs when determining future damages. Considering the testimony the jury heard concerning Courtnie's present physical state, her past medical care and expenses, and the nature and course of her injuries, the evidence is legally sufficient to sustain the jury's award of $600,000 in medical expenses Courtnie and her parents will incur before Courtnie reaches eighteen, and $600,000 in medical expenses after Courtnie reaches age eighteen.

■ The jury also awarded Courtnie and her parents $335,000 for past and future physical impairment, $500,000 for lost earnings and lost earning capacity, $850,000 for physical pain and mental anguish, and $50,000 for disfigurement. Dr. Roberts argues that there is no evidence to support any of these awards. The jury heard testimony establishing the following: Courtnie suffered permanent and severe brain damage. Her fine motor skills are permanently impaired. Courtnie will never be able to attend or graduate from college. She has a significantly diminished I.Q. and a developmental gap that will only worsen with time. She has behavioral problems and difficulty communicating, which will impair her ability to work. The damage to the right side of Courtnie's brain permanently and visibly weakened her left arm and leg, and Courtnie must wear leg braces in order to walk. Courtnie has a permanent and noticeable shunt imbedded in her skull to drain excess fluid from her brain. Courtnie has problems with her attention span and her coordination. She bites herself and bangs her head on the floor. Based on the foregoing reasons, more than a scintilla of evidence exists to support Courtnie's permanent impairment, disfigurement, physical pain, mental anguish, and loss of earning capacity.

■■■■ Additionally, Dr. Roberts contends that there was no evidence of physical impairment and no evidence forming the basis for the *damages* awarded for Courtnie's physical impairment. As the above evidence indicates, the Williamsons established evidence of physical impairment. However, Dr. Roberts urges this court to find that in order to be entitled to damages for physical impairment, the Williamsons were required to present evidence of the costs associated with those impairments and cites *Landacre v. Armstrong Bldg. Maint. Co.*, 725 S.W.2d 323, 324 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.), for that proposition. However, *Landacre* does not require that a plaintiff prove specific costs be incurred as a result of the physical impairment in order for damages to be proper. In *Landacre*, the Corpus Christi court, quoting *Allen v. Whisenhunt*, 603 S.W.2d 242 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ dism'd), states that the plaintiff must

> sustain the burden of proving that the effect of his physical impairment extends beyond impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.

*Id.* at 244 (citing *Green v. Baldree*, 497 S.W.2d 342, 350 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ)). There is no formula for determining a dollar amount that will compensate the plaintiff for personal injuries. *Austin v. Shampine*, 948 S.W.2d 900, 915 (Tex.App.—Texarkana 1997, writ dism'd by agr.). No mathematical standard exists for the determination of the money damages a jury may award for physical impairment, and the jury may assess those damages in its discretion. *N. Am. Refractory Co. v. Easter*, 988 S.W.2d 904, 912 (Tex.App.—Corpus Christi 1999, pet. denied). Once a plaintiff establishes that physical impairment exists, that plaintiff need not establish a dollar amount corresponding to that impairment. We cannot, therefore, say that there was no evidence of damages for physical impairment.

■■■■ Dr. Roberts also contends that there was no evidence to support the amount of damages awarded for loss of earning capacity and future lost earnings. She contends that the plaintiffs were required to prove specific monetary losses that Courtnie would incur due to her loss of earning capacity. Although a reduction in earnings is the best way to show damages from loss of earning capacity, it is not the only way to show those damages. *Springer v. Baggs*, 500 S.W.2d 541, 544 (Tex.Civ.App.—Texarkana 1973, writ ref'd n.r.e.). There is no general rule governing the proof required to establish loss of earning capacity damages; each case is to be judged on its own merits. *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710, 712 (1943). "Where plaintiff is a child, who has never earned any money, the jury must determine the value of its lost earning capacity altogether from their common knowledge and sense of justice." *Id.* Additionally, the lack of direct testimony or specialist testimony on the effect of a child's injuries on his future income does not invalidate the jury's damage award for lost earnings. *Pipgras v. Hart*, 832 S.W.2d 360, 366 (Tex.App.—Fort Worth 1992, writ denied). In light of these cases, the damages awarded by the jury were within its discretion, and Dr. Roberts's no evidence challenge fails.

Appellant's second point is overruled.

**Parent's Right to Loss of Consortium with a Nonfatally Injured Child**

In her third point, Dr. Roberts challenges the jury's $75,001 loss of consortium award to the Williamsons arguing

that Texas does not recognize the right of parents to recover for loss of consortium with a nonfatally injured child. Dr. Roberts bases her argument on *Reagan v. Vaughn,* 804 S.W.2d 463 (Tex.1990), where the Texas Supreme Court recognized the right of a child to recover for loss of consortium with a nonfatally injured parent. The *Reagan* court reasoned that a child should be able to recover for loss of consortium with a parent because that parent can no longer provide guidance, care, or support for the child. *Id.* at 466.

Dr. Roberts argues that the *Reagan* opinion implies that since a child cannot care for its parents, parental recovery for loss of consortium is inappropriate. *Reagan* did not mention, much less specifically preclude, the right of parents to recover for loss of consortium with a nonfatally injured child. As a matter of fact, the court emphasized the parent-child relationship as one deserving special protection. *Id.* Moreover, the Austin Court of Appeals has concluded that a parent does have the right to recover for loss of consortium with a nonfatally injured child. *Enochs v. Brown,* 872 S.W.2d 312 (Tex.App.—Austin 1994, no writ). To hold that a parent cannot recover would ignore the basic idea behind recovery for loss of consortium: to attempt to compensate for the loss of love and companionship.

■ Alternatively, Dr. Roberts argues that even if the parents do have a right to recover for loss of consortium with a child under Texas law, the court failed to submit to the jury the question of whether Courtnie's injuries were serious, permanent, and disabling. However, this question need be submitted to the jury only if the injury is disputed. *See Reagan,* 804 S.W.2d at 468 (op. on reh'g). Dr. Roberts has not shown that the seriousness, permanence, or disabling nature of Courtnie's injuries was contested at trial. Dr. Roberts did not

take issue with the extent of the injuries at trial; therefore, the trial court's refusal to submit the question to the jury was not error.

■ Further, Dr. Roberts contends that the jury's loss of consortium finding is not supported by factually sufficient evidence. A party must raise a point in a motion for new trial as a prerequisite to challenging the factual sufficiency of the evidence on appeal. Tex.R. Civ. P. 324(b)(2). Here, Dr. Roberts's Motion for New Trial was filed on February 18, 2000, over thirty days after the judgment was signed. Thus, her Motion for New Trial was untimely. Tex.R. Civ. P. 329b(a). As such, the trial court was without power to consider the Motion for New Trial. *Ferguson v. Globe-Texas Co.,* 35 S.W.3d 688, 690 (Tex.App.—Amarillo 2000, pet. denied).

Dr. Roberts contends her motion was timely under the mailbox rule. Under the mailbox rule, a document is deemed timely filed if (1) it is sent to the proper clerk, (2) by first-class United States mail, (3) in a properly addressed and stamped envelope, (4) on or before the last day for filing, and (5) it is received not more than ten days late. Tex.R. Civ. P. 5. In addition, a legible postmark affixed by the United States Postal Service is prima facie evidence of the date of mailing. *Id.* However, the record does not contain any evidence of compliance with the mailbox rule.

■ Even if the trial court could have considered Dr. Roberts's first Motion for New Trial, she did not include the factual sufficiency point until she filed her Amended Motion for New Trial on April 3, 2000. This amended motion was also untimely, having been filed more than thirty days after the judgment was signed. Tex.R. Civ. P. 329b(b). Therefore, the trial court could not consider Dr. Roberts's Amended

Motion for New Trial. *Ferguson*, 35 S.W.3d at 690. Consequently, Dr. Roberts has failed to preserve her factual sufficiency point, and we will not consider it.

Appellant's third point is overruled.

**Settlement Credit**

■■■ In her final point, Dr. Roberts argues that the court erred by refusing to apply a settlement credit to the Williamsons' recovery. The jury's verdict assessed the total damages to Courtnie and her parents at $3,010,001. The jury found Dr. Roberts only fifteen percent responsible for the damages. Based on these findings, the trial court rendered judgment against Dr. Roberts for $451,500.15, an amount equal to fifteen percent of the total damages.

The evidence shows that the Williamsons settled claims against the hospital and two other doctors for $468,750. Dr. Roberts argues that according to TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997), the settlement money should be deducted from her total liability of $451,500.15 on the dollar-for-dollar basis that she elected under Section 33.012(b). Such a reduction would allow the plaintiffs no recovery from Dr. Roberts. Alternatively, Dr. Roberts argues that the trial court should have reduced the total amount of damages ($3,010,001) by the settlement amount ($468,750) leaving $2,541,251, and the court should have then multiplied that amount by fifteen percent to reach a $381,187.65 judgment against her.

In *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315 (Tex.1994), the Texas Supreme Court held that when a defendant is not jointly and severally liable, that defendant's monetary liability is calculated under TEX. CIV. PRAC. & REM.CODE ANN. § 33.013(a) (Vernon 1997) by multiplying its percentage of fault by the total damages assessed by the jury. *C & H Nation-*

*wide, Inc.*, 903 S.W.2d at 321. When the liability of a not jointly and severally liable defendant is at issue, TEX. CIV. PRAC. & REM.CODE ANN. § 33.012 (Vernon 1997) creates a cap on the amount of damages for which the defendant in the litigation can be liable. The principle articulated in *C & H Nationwide, Inc.* adheres to the purpose behind the settlement credit statutes: preventing a plaintiff from obtaining a recovery in excess of the plaintiff's total damages. Dr. Roberts argues that *Drilex Sys., Inc. v. Flores*, 1 S.W.3d 112 (Tex. 1999), sets out the rule that the damages should be reduced by the percentage liability attributed to *all* parties besides the defendant and that the settlement credit should then be applied; however, the *Drilex* court only reduced the total amount of damages by the percentage of the *plaintiff's* responsibility before it applied the settlement credits. *Id.* at 122 n. 9. Dr. Roberts's interpretation of *Drilex* would allow the defendant who remained in the suit to have all other parties' percentages of fault deducted from the total damages, leaving only her percentage. Dr. Roberts would then apply that credit to her liability alone. Not only is this result unjust, it is clearly not the holding of *Drilex*. We will therefore follow *C & H Nationwide*.

In our case, Dr. Roberts was not jointly and severally liable under TEX. CIV. PRAC. & REM.CODE ANN. § 33.013(b) (Vernon 1997) because her liability did not exceed fifty percent. She is not jointly and severally liable under TEX. CIV. PRAC. & REM.CODE ANN. § 33.013(c) because the plaintiffs' injuries did not result from a toxic tort or the release of hazardous or harmful substances. Therefore, under TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(a) and *C & H Nationwide*, Dr. Roberts's liability is calculated by multiplying her percentage of fault (fifteen percent) by the total amount of damages ($3,010,001), to equal

$451,500.15. Under TEX. CIV. PRAC. & REM. CODE ANN. § 33.012, Dr. Roberts's exposure is capped at $2,541,251 (the total amount of damages ($3,010,001) minus settlements ($468,750)). Dr. Roberts's liability did not exceed the cap. The trial court's calculation of liability was correct, and Dr. Roberts's fourth point is overruled.

The judgment of the trial court is affirmed except as it applies to ad litem fees which are reversed in a separate appeal in cause 06–00–00014–CV, *Williamson v. Roberts,* 52 S.W.2d 354 (Tex.App.—Texarkana 2001).